**BLACK & YATES, Inc., et al. v. MAHOG-ANY ASS'N, Inc., et al.**

No. 92 Civil.

District Court, D. Delaware.

· Aug. 1, 1940.

Wallace H. Martin (of· Nims & Verdi), New York City, and Hugh M. Morris and S. Samuel Arsht, both of Wilmington, Del., for plaintiff.

William P. McCool, of New York City, and Arthur G. Logan (of Logan & Duffy), of Wilmington, Del., for defendant Mahogany Ass'n., Inc.

J. Montgomery Forster, of Philadelphia, Pa., and Arthur G. Logan (of Logan & Duffy), of Wilmington, Del., for Thompson Mahogany Co.

NIELDS, District Judge.

Pursuant to Rule 12 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, each defendant moves to dismiss

the complaint, as supplemented by the bills of particulars, for failure to state a claim upon which relief can be granted.

For over fifteen years plaintiffs and their associates have been defendants before the Federal Trade Commission on a charge of unfair competition. That proceeding is still pending. The Commission determined the fundamental issue and found that red lauan, white lauan, tanguile and other Philippine woods were not mahogany, botanically or commercially. Plaintiffs were enjoined from asserting the contrary in trade. Also the Commission found there is a standard and genuine mahogany.

The Commission is now engaged in the trial of the secondary issue—whether the term "Philippine mahogany" has acquired "a title to legitimacy by force of common acceptation" within the rule laid down in Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 80, 54 S.Ct. 315, 78 L.Ed. 655.

### History of the Case

In 1925, the Federal Trade Commission issued identical complaints against a group of companies dealing in Philippine mahogany including the plaintiffs and, Indiana Quartered Oak Company. Plaintiffs were identified thus:

Thomas E. Powe & Company, Docket No. 1281.

Indiana Quartered Oak Company, Docket No. 1316.

Black & Yates, Inc., Docket No. 1736.

The complaint against all the members of the group was that of deceiving the public by passing off red lauan, white lauan, tanguile and other woods as genuine mahogany.

1925–1926. By agreement Indiana Quartered Oak Company was selected as the test case binding all. A vast quantity of testimony was taken by the Commission from scientists, dealers, retailers, furniture manufacturers and members of the public. It was shown that the term "Philippine mahogany" created the impression that the woods were genuine mahogany and that "Philippine" denoted the country of origin according to the trade custom, i. e. Honduras mahogany.

1926 (June). Indiana Quartered Oak Company case was argued before the Commission.

1926 (July). The Commission found against the respondents in that case and entered orders to cease and. desist.

1926 (December). The Commission granted an application for further hearing and held up the orders to cease and desist.

1927. Additional testimony was taken.

1927 (June). The case was reargued before the Commission.

1927 (August). The Commission made certain final findings[1] and entered the

[1] Par. 3: A large and important part of the hardwood and hardwood products sold and transported by respondent in interstate commerce is called by respondent "Philippine mahogany", and is grown in and imported from the Philippine Islands. This wood has been known and traded in for years prior to the filing of the Complaint herein both in the Philippines and in the United States under the names Lauan and Tanguile. Other trade names employed for these woods are red Lauan, white Lauan, Bataan, Lamac, Almon, Apitong, Orion, Batang, Bagaac, Batak, and Balachacan.

Par. 4: About 85% of the Philippine woods sold as "Philippine mahogany" imported through the Pacific Coast ports is imported under the trade names set out in Paragraph Three above. Some importers sell these woods to lumber dealers, furniture manufacturers, and others under their native or trade names. Respondent and other importers sell it to furniture manufacturers, dealers and others as "Philippine mahogany". After sale by the importers last referred to, the manufactured products are sold by the said furniture manufacturers to retail furniture dealers and others as "mahogany", "genuine mahogany", or "solid mahogany". Such products are resold by retail furniture dealers to the public as and for products made of "mahogany", "genuine mahogany", or "solid mahogany".

Par. 5: Many of the importers and a substantial number of lumber dealers in this country use and deal in woods of the type sold by respondent as ."Philippine mahogany", but under the native or trade names in Paragraph Three set forth.

Par. 6: The Lauan and Tanguile sold by respondent as "Philippine mahogany" are the product of the tree family scientifically known as Dipterocarpaceae. This tree family is not scientifically or botanically related to the tree family Meliaceae, the product of which constitutes true mahogany.

Par. 7: The Philippine hardwoods sold by respondent and others, as hereinabove described, are the only woods derived from a tree family other than Meliaceae,

following order to cease and desist: "* * * that the respondent, Indiana Quartered Oak Company, its officers, directors, agents, employees and successors do cease and desist from advertising, describing or otherwise designating or selling or offering for sale under the term 'mahogany', 'Philippine Mahogany' or under any term of similar import, woods known under the common or trade names, 'red lauan,' 'white lauan', 'tanguile' * * * or any other wood, lumber or wood products, unless such wood or lumber, or the wood from which such products are made, is derived from the trees of the Mahogany or Meliaceae family".

Further, the Commission designated the Court of Appeals for the second Circuit to hear the appeal.

1927 (October). The appeal was heard.

1928 (May 14). The Circuit Court of Appeals affirmed the order of the Commission.[2]

to which the term mahogany has been applied. Of the genera of this family, only one, "Swietenia", produces true mahogany. There are five known species of Swietenia.

Par. 8: The term "African mahogany" has been applied commercially to the product of "Khaya" of the genera of Meliaceae, of which there are about four known species.

Par. 9: Trees of the Swietenia group producing true mahogany grew principally in the West Indies, Southern Florida, Southern Mexico, Central America, Venezuela and Peru. No species of the genus Swietenia of this tree family grows in the Philippine Islands, except as specially planted for decorative or experimental purposes.

Par. 10: The Spanish words "Caoba des Filipinos", meaning "Philippine mahogany", are occasionally used in the Philippine Islands to designate native woods resembling mahogany in grain, texture and color. This term was known in the Philippines, but not used in connection with the sale of lumber. It does not appear that this expression was used prior to the American occupation. Prior to 1916 the Philippine Government, as represented by its Director of Forestry, opposed the practice of American Importers in selling Philippine hardwoods as Philippine mahogany.

Par. 11: When Philippine hardwoods leave the Philippine Islands for the United States, they are shipped under the native names, Lauan, Tanguile, etc. The invoices on which the taxes are levied are made out under the native names, this being by agreement with the Bureau of Customs, as well as the railroad companies, so that the shipping invoices will conform to the manifest on which the Government charge has been paid.

Par. 18: In addition to the scientific and botanical distinctions used by wood technologists, many of the characteristics and virtues possessed by mahogany are lacking in the Philippine hardwoods sold by the respondent as mahogany under the name Philippine mahogany.

The absence of such characteristics and virtues prevents such hardwoods from serving certain uses for which mahogany is particularly adapted. While there is conflict in the evidence, the weight is to the effect that Philippine hardwoods are not suitable for the following uses, and the Commission so finds:

(a) Such woods are not suitable for cabinet-making because of the great prevalence of worm-holes which constitute serious defects in all Philippine woods.

(b) They are not suitable for the construction of lamps because they do not take a proper finish.

(c). They are too soft to be suitable for flooring.

(d) They are not susceptible to the finish required by piano manufacturers on the exposed surfaces of pianos.

(e) They are not suitable for carving.

(f) When used in furniture it is necessary to fill the worm-holes before the wood is stained or varnished and polished. The filling at times sinks into these holes, destroying the even appearance of the surface.

(g) They do not retain the sub-surface lustre peculiar to mahogany and unlike mahogany they do not beautify with age. * * *

Conclusions

The practices of said respondent, under the conditions and circumstances described in the foregoing findings, are unfair methods of competition in commerce and constitute a violation of the Act of Congress approved September 26, 1914, 38 Stat. 717, 15 U.S.C.A. § 41 et seq., entitled "An Act To create a Federal Trade Commission, to define its powers and duties, and for other purposes".

2 It is now well settled that findings of fact by the Commission, having any evidence to support them, are conclusive and binding upon the courts reviewing the weight of the testimony. * * * .

It is established that not all trees, shrubs or bushes belonging to the Meliaceae, the mahogany tree family, produce mahogany lumber. But there is ample expert testimony establishing that no

1928 (October). Application of respondent for certiorari denied by the Supreme Court, 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544.

1930. Philippine interests request Commission to reopen the case by selecting a new test case to relitigate whether the term "Philippine mahogany" is still deceptive. This request was granted and Gillespie Furniture Company, Docket No. 1739, was made the test case.

1930-1931. Testimony was taken in the Gillespie case. The scientific testimony in the Indiana Quartered Oak case was stipulated.

1931 (June 30). The Commission dismissed the complaint and approved a stipulation permitting the use of the term "Philippine mahogany" as a trade name, disclaiming identity with genuine mahogany.

1932 (May 9). On petition of Indiana Quartered Oak Company, consented to by the Commission, the Circuit Court of Appeals modified its decree of May 14, 1928 to the extent of permitting Indiana Quartered Oak Company to use the name "Philippine mahogany" under the terms of the Gillespie stipulation.

Meanwhile and for some time prior to June 15, 1931, the Commission was considering a similar charge of unfair competition regarding the use of the term "California White Pine" as applied to a wood not genuine white pine.

June 15, 1931. The Commission filed a decision along the lines of the decision in the Indiana Quartered Oak case and issued similar orders to cease and desist.

1933. The White Pine case was reversed by the Circuit Court of Appeals for the Ninth Circuit. Algoma Lumber Co. v. Federal Trade Commission, 64 F.2d 618. On application of the Commission certiorari was granted by the Supreme Court. 290 U.S. 607, 54 S.Ct. 67, 78 L.Ed. 532.

1934 (January 8). The Supreme Court reversed the Circuit Court of Appeals and affirmed the Federal Trade Commission. The court through Mr. Justice Cardozo said:

"Third. The argument is made that the name for the respondents' lumber was adopted more than thirty years ago without fraudulent design, and that a continuation of the use is not unfair competition, though confusion may have developed when the business, spreading eastward, attained national dimensions.

"The Commission made no finding as to the motives animating the respondents in the choice of the contested name. The respondents say it was chosen to distinguish their variety of yellow pine from the harder yellow pines native to the

---

wood is mahogany unless it is wood from the tree of the mahogany tree family, and no wood is true mahogany unless it is of the genus Swietenia of that family. * * * And the experts justified the findings of the Commission that the woods imported from the Philippine Islands and sold by the respondent as "Philippine mahogany" are not from any tree of the Meliaceae tree family. The Commission found that the representation of these woods as Philippine mahogany has caused dealers in the furniture and allied commodities to purchase such wood products in the belief that they are mahogany woods, and in turn to sell to retail dealers articles of furniture, and allied commodities for articles of mahogany woods, which, when they ultimately reach the consuming public, become a fraud upon it. It found that such sales and practices deceived a substantial portion of the trade, and the purchasing public in substantial numbers, because such purchases were made or induced under the belief that they were products made of true mahogany, and therefore there was injury to the purchasing public and to the honest competitors of the petitioner. To support this finding, there was much testimony of witnesses who were engaged in the furniture business for a long period of years.

If, as argued by the petitioner, the term "Philippine mahogany" has acquired a secondary meaning, in that the trade does not understand it to mean genuine mahogany, but a wood having some of the characteristics and qualities of mahogany, that will not permit the petitioner to escape the charge of deception or misleading the public. The trade as a whole, does not understand that "Philippine mahogany" is not mahogany, but such understanding is limited to dealers who actually sell the rough lumber. Retailers of furniture, builders of houses and boats, testified that they understood the word to mean genuine mahogany. Indeed, some of the manufacturers of furniture, who used the lumber as a raw material, do not understand that it is not true mahogany. If the term deceives the purchasing public, its use may not be continued. Indiana Quartered Oak Co. v. Federal Trade Commission, 26 F.2d 340.

southern states. We may assume that this is so. The fact remains, however, that the pines were not white either botanically or commercially, though the opportunity for confusion may have been comparatively slight when the sales were restricted to customers in local markets, buying for home consumption. Complaints, if there were any, must have been few and inarticulate at a time when there was no supervisory body to hold business to its duty. According to the law as then adjudged, many competitive practices that today may be suppressed (Federal Trade Comm. v. Winsted Hosiery Co., supra [258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729]), were not actionable wrongs, the damage to the complainants being classified often as collateral and remote. American Washboard Co. v. Saginaw Mfg. Co. [6 Cir.], 103 F. 281, 286, 50 L.R.A. 609. The Federal Trade Commission was not organized till 1914, its jurisdiction then as now confined to interstate and foreign commerce. Silence up to that time is not even a faint token that the misapplied name had the approval of the industry. It may well have meant no more than this, that the evil was not great, or that there was no champion at hand to put an end to the abuse. Even silence thereafter will not operate as an estoppel against the community at large, whatever its effect upon individuals asserting the infringement of proprietary interests. French Republic v. Saratoga Vichy Co., 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247. There is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for deception or mistake, unless submission has gone so far that the occasion for misunderstanding, or for any so widespread as to be worthy of correction, is already at an end. Competition may then be fair irrespective of its origin. This will happen, for illustration, when by common acceptation the description, once misused, has acquired a secondary meaning as firmly anchored as the first one. Till then, with every new transaction, there is a repetition of the wrong.

"The evidence here falls short of establishing two meanings with equal titles to legitimacy by force of common acceptation." Federal Trade Comm. v. Algoma Co., 291 U.S. 67, 79, 54 S.Ct. 315, 320, 78 L.Ed. 655.

The above opinion has clarified the law of "secondary meaning". Thereafter counsel for the Commission filed with the Commission a petition to reconsider the Gillespie case so far as it permitted the use of the term "Philippine mahogany" so that the Commission might redetermine whether the term was not deceptive under the rule of the Supreme Court in the California White Pine case.

1939 (January 3). The Commission granted the petition to reopen the Gillespie case. At the same time it limited the issue to whether the term "Philippine mahogany" was deceptive.

1939 (to date). Testimony has been taken in the reopened Gillespie case in accordance with the order of the Commission.

Plaintiffs' arguments are all disposed of by Mr. Justice Cardozo in the California White Pine case. He recognized the admissibility of scientific proof. To respondents' contention that one lumber was as good as the other he replied "substitution would be unfair though equivalence were shown". He further found both confusion and prejudice. To the argument that the substitute cost less and therefore the customer was not prejudiced he said: "But saving to the consumer, though it be made out, does not obliterate the prejudice. Fair competition is not attained by balancing a gain in money against a misrepresentation of the thing supplied. The courts must set their faces against a conception of business standards so corrupting in its tendency. The consumer is prejudiced if upon giving an order for one thing, he is supplied with something else."

In the California White Pine case respondents contended that by long established trade custom California white pine had acquired a "secondary meaning" but in Federal Trade Comm. v. Winsted Co., 258 U.S. 483, 42 S.Ct. 384, 385, 66 L.Ed. 729, the Supreme Court dealt with that contention. There the respondents had sold knit underwear as "merino" or "Australian wool" although it was not wholly composed of wool. The court held that the word "Australian" was a source adjective and was not deceptive as applied to a substitute. The court points out that the use of a geographic adjective as a part of a tradename is readily deceptive since the geographical term implies only

the place of origin. Moreover, the word "Philippine" is more potent to deceive because of the trade custom of prefixing a source adjective to mahogany, i. e. "Honduras mahogany". As to the word "merino", the court said: "While it is true that a secondary meaning of the word 'Merino' is shown, it is not a meaning so thoroughly established that the description which the label carries has ceased to deceive the public;"—and as long as a substantial part of the consuming public might be deceived, its use is barred. The Winsted case was cited with approval by Mr. Justice Cardozo and was specifically applied to a misbranding of lumber.

Finally, in the California White Pine case respondents claimed their motives were fair but the court held motive was no excuse saying "Indeed there is a kind of fraud, * * * in clinging to a benefit which is the product of misrepresentation, * * *."

The Commission has reopened the Gillespie case because of the opinion of the Supreme Court in the California White Pine case. The Federal Trade Commission is now engaged in the trial of the secondary issue whether "Philippine mahogany" has acquired a title to legitimacy by force of common acceptance within the rule as stated by the Supreme Court. That case is now pending. The Government's testimony is completed. Respondents (plaintiffs here) have secured a delay in the production of their evidence. In this situation plaintiffs seek to shift and impose upon this court a retrial of the entire issue.

### The Complaint

Paragraph 23 of the complaint was amplified by plaintiffs. In one of their bills of particulars plaintiffs state that representatives of the defendant association or one or more of them have made statements or representations in writing or orally to the effect that:

(a) Philippine mahogany is a substitute;

· (b) Philippine mahogany is not a mahogany wood;

(c) Mahogany wood comes only from the West Indies, America or Africa;

(d) A dealer is unethical who sells Philippine mahogany under that name;

(e) To sell Philippine mahogany under that name deceives the public;

(f) Philippine mahogany is a misnomer;

(g) Woods labeled Philippine mahogany are mislabeled;

(h) Philippine mahogany is in no way related to mahogany;

(i) Philippine mahogany is an inferior wood and not comparable to mahogany, has none of the qualifications of mahogany and will not stand up;

(j) Botanical classification of woods is controlling in the lumber trade;

(k) The sale of African mahogany as "genuine mahogany" meets the requirements of such institutions as the Better Business Bureau and the Federal Trade Commission;

(l) Wood technologists and botanists unanimously agree that there are three types of mahogany, viz., African, Central and South American and West Indian;

(m) The use of the term Philippine mahogany is not legitimate;

(n) No mahogany is grown in the Philippines;

(o) There is no such thing as Philippine mahogany;

(p) Philippine woods are wrongly known as Philippine mahogany;

(q) Philippine wood is in no sense mahogany;

(r) Philippine mahogany is a counterfeit and a substitute and a fraud;

(s) To sell Philippine mahogany is unfair competition;

(t) The Federal Trade Commission has ruled that the Philippine woods have no right to the designation Philippine mahogany, that this ruling has been upheld by the courts and confirmed by the Supreme Court, without at the same time accompanying such statement with the statement that the Circuit Court of Appeals passed merely on the law and not on the facts and that the denial of a petition for a writ of certiorari by the Supreme Court was not in confirmation of the decision of the Circuit Court of Appeals and without also making the statement that the Federal Trade Commission had subsequently reversed itself on the facts by permitting the use of the term "Philippine mahogany".

(u) In the case pending before the Federal Trade Commission, it is expected that the Commission will rule that the

name. "mahogany" can not be applied to any of these Philippine woods.

In their brief plaintiffs state that this action is not an action for trade libel but is an action in part to enjoin unfair competition consisting of disparagement of plaintiffs' goods, coercion and intimidation of plaintiffs' customers, interference with plaintiffs' relations with their customers and unfair and prejudicial use of decisions of courts and administrative tribunals. And again, that the present case is not one involving the sale of a spurious article for a genuine one, but is one to enjoin defendants from continuing their preconceived plan of unfairly competing and of destroying competition by making false and disparaging statements with reference to plaintiffs and their business.

Plaintiffs claim they have two causes of action:

1. For a conspiracy prohibited by the anti trust acts.

2. For unfair competition entitling them to an injunction in equity because of their disparaging plaintiffs' goods.

However, the complaint fails to set forth a single element of a cause of action under the Sherman or Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 note and 38 Stat. 730. The references to the acts are a paraphrase of words of the statutes and as such are conclusions of law. All we have is a mere repetition of the words of the statute without a single well pleaded allegation showing the substantial facts upon which the grievance is founded. It is necessary to establish by facts well pleaded not only that a combination exists but that it has a "necessary tendency to cause direct and undue restraint of competition in commerce." Usually where a trade association is involved, the facts establish that the association is a subterfuge for a price fixing scheme. Here there was no agreement affecting production, fixing prices or trade maintenance. Members of the association are free to sell as they choose. The anti trust acts have a single purpose: To prevent any combination of persons from monopolizing commerce in a particular commodity and destroying competition in trade to the injury of the public. The evils of monopoly may be achieved by (1) voluntary restraint such as price fixing agreements impose, or (2) by involuntary restraints such as black lists, boycotts or direct interference.

If it were true that some great combination had been formed which monopolized the entire field of genuine mahogany, curtailed production and raised prices, this would not affect plaintiffs because they are not engaged in that trade. The plaintiffs sell a substitute. Their grievance is that dealers in genuine mahogany proclaim the spurious character of their goods.

All that is said to sustain a cause of action under the Sherman and Clayton acts is contained in two paragraphs of the complaint. Paragraph 22 alleges that "defendant association, its members, * * and others" devised a plan and scheme in restraint of trade "for the purpose of substantially lessening or destroying the competition", i. e. the competition between plaintiffs' products and genuine mahogany. Nowhere in the complaint is there given the slightest detail as to this alleged plan and conspiracy or as to the facts bringing into operation the anti trust acts. All that plaintiffs could say was that they hoped to get the information by examination of defendants' officers before trial.

Paragraph 23 of the complaint charges that the defendants made unfair statements to the trade with respect to the commercial usage of the term "mahogany" or "Philippine mahogany" so as to bring plaintiffs' merchandise into disrepute. Again plaintiff was asked for details.

All this amounts to is "unfair competition" in the moral sense as defined in section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, which does not destroy competition or monopolize business but makes it more difficult for plaintiffs to secure the advantage of using the words "Philippine mahogany". There is not a single fact alleged that brings into action the anti trust statutes.

### Disparagement

Plaintiffs suggest they have an independent cause of action in equity for disparagement of goods. Disparagement of goods is a form of libel. The remedy is at common law. Francis v. Flinn, 118 U.S. 385, 6 S.Ct. 1148, 1150, 30 L.Ed. 165. In that case the plaintiffs owned a pilot boat. Defendants conspired to interfere with that business by publishing statements that plaintiff had no right to use their vessels as pilot boats. Whereupon plaintiffs brought suit in equity for an injunction. The Supreme Court held there was

no ground for equitable relief and that plaintiffs remedy was at common law for damages. The court said: "If a court of equity could interfere and use its remedy of injunction in such cases, it would draw to itself the greater part of the litigation properly belonging to courts of law."

Defendants here are the aggrieved parties. Where commerce has been restrained and interfered with by unfair trade practices there was no adequate remedy at law or in equity. Therefore Congress enacted the Federal Trade Commission Act.

The remedy of plaintiffs, if they be entitled to one, is before the Federal Trade Commission. That fact finding body, like a jury, has heard the Government's side and is awaiting production of plaintiffs' proof. No useful purpose would be served by an injunction issuing from this court before the Federal Trade Commission has determined the issues pending before it. The right to an injunction largely depends upon whether plaintiffs have the right to use the phrase "Philippine mahogany" in its secondary meaning. That is the precise issue now being heard by the Federal Trade Commission.

The motions to dismiss must be granted.