**BLACK & YATES, Inc., et al. v. MAHOG-
ANY ASS'N, Inc., et al.**

No. 7561.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

Reargued Dec. 5, 1941.

On Rehearing June 10, 1942.

228

Wallace H. Martin, of New York City (Hugh M. Morris, of Wilmington, Del., and Harry D. Nims and Minturn deS. Verdi, both of New York City, and S. Samuel Arsht, of Wilmington, Del., on the brief), for appellants.

Wm. P. McCool, of New York City (Arthur G. Logan, and Logan & Duffy, all of Wilmington, Del., on the brief), for defendant-appellee Mahogany Associates, Inc.

J. Montgomery Forster, of Philadelphia, Pa. (Arthur G. Logan, of Wilmington, Del., on the brief), for appellee Thompson Mahogany Co.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

CLARK, Circuit Judge.

The learned district judge seems to us to have been influenced by his solution of an issue that did not happen to be before him. The parties are the protagonists in a fifteen year battle.[1] The contest began with botany and is ending with geography. The three plaintiffs sell a hardwood which grows in the Philippine Islands and to which they have added the designation "mahogany". The defendants are an association and the members thereof which and who claim to be the true prophets of mahogany. They base that claim on certain botanical considerations with which the Federal Trade Commission and the courts at first (1927 and 1928) agreed.[2, 3] After that original agreement, however, the statutory body vested with jurisdiction abandoned botany for geography. It approved (1931) a stipulation which reads: "Respondent hereby stipulates and agrees that in its sale, description, and advertisement of the wood of the Philippine Islands which it has heretofore designated and described as 'Philippine Mahogany' and articles of commerce

---

[1] Black & Yates, Inc. et al. v. Mahogany Association, D.C., 34 F.Supp. 450.

[2] Indiana Quartered Oak Co. v. Federal Trade Commission, 2 Cir., 1928, 26 F. 2d 340.

[3] According to the botanists, mahogany is produced only by the genera Swietenia of the Meliaceae family, no specimen of which grows in the Philippine Islands. Wright, Handbook of the Philippines, p. 122 et seq.; Williams, United States and the Philippines, p. 300; Lamb, The Mahogany Book, 3d Ed., published by the Mahogany Association, Inc.; The Texture of Philippine Mahogany (pamphlet), Philippine Mahogany (pamphlet), both published by the Philippine Mahogany Manufacturers' Import Assn.; Stately Mahogany, A Condensed Reprint of Four Radio Talks Broadcasted from Station WEAF, New York City.

made therewith, it will not employ the word 'mahogany' in connection with the sale of said wood without the modifying term 'Philippine'." Gillespie Furniture Co., 15 F.T.C.Decisions 444.

As the Federal Trade Commission had changed its mind, the enforcing Circuit Court of Appeals was compelled to do likewise and so modified its original decree.[4] Thereafter a 1934 decision in the United States Supreme Court occasioned still further irresolution on the part of the Commission. That case[5] prescribed a high degree of proof as essential to the acquisition of a "secondary" trade meaning.[6] In obedience to the ratio decidendi of this California White Pine holding, the Federal Trade Commission was constrained to and did reopen the controversy for the second time. The reopening, of course, took the form of a call for a further evidential interpretation of the term "Philippine Mahogany".

At this point, the defendant association indulged itself in a bit of forecasting. It did not wait for the revised decision—it attempted a preview. It is of the nature of its anticipation that the plaintiffs now complain. It consists of statements (both oral and written) which were based on the assumption that Philippine Mahogany had not acquired a secondary meaning and which were widely circulated in the hardwood trade. From the assumption it followed, to quote typical assertions of the defendants, that:

(1) "Philippine mahogany is a substitute, is not a mahogany wood, is a misnomer, is in no way related to mahogany, is an inferior wood and not comparable to mahogany, has none of the qualifications of mahogany and will not stand up, is a counterfeit, a substitute and a fraud".

(2) "A dealer is unethical who sells Philippine mahogany under that name".

(3) "To sell Philippine mahogany under that name deceives the public".

(4) "To sell Philippine mahogany is unfair competition."

(5) "In the case pending before the Federal Trade Commission, it is expected that the Commission will rule that the name 'mahogany' cannot be applied to any of these Philippine woods." Plaintiffs' Bill of Particulars, paragraphs a, b, f, h, i, r, d, e, s, and u, Appendix to plaintiffs-appellants' brief, pp. 33-34.

It is conceded, as it must that these statements are disparaging. They reflect seriously upon the plaintiffs' property and business practice; and falsely so, unless and until such reflection is sanctioned by a court's condemnation. The learned district judge unconsciously influenced, as we think, by his own disapproval of the practice and by his confidence that the courts will ultimately share his view—as well they may—dismissed the bill. He placed the refusal to enjoin the continuance of the uncomplimentary references on what we deem to be an obsolete conception of the law. The case[7] relied on is of doubtful application and was decided in 1886. We believe that the law has developed since that time.

The right of action for disparagement of property was slow in developing at common law. The early cases took a Shaksperian view.[8] So they lagged behind the analogous attack on personality by way of defamation, although an attack on what a man owns and sells would seem to be just as injurious as an attack on what he is. As one might expect the classic exposition is by Professor Jeremiah Smith.[9] After the courts crystallized the tort[10] certain elements remained uncertain.

[4] Indiana Quartered Oak Co. v. Federal Trade Commission, 2 Cir., 1932, 58 F. 2d 182.

[5] Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655.

[6] For discussion of secondary meaning, see: Nims, Unfair Competition and Trade-Marks, 3d Ed. 1929, §§ 36-42; Derenberg, Trade-Mark Protection and Unfair Trading §§ 28-32; 63 C.J. 393-396; Equity; Unfair Competition; The Shredded Wheat Case, 24 Cornell Law Quarterly 255; Unfair Competition—Trade-Name—Distinction Between Description and Secondary Meaning, 23 Washington University Law Quarterly 138.

[7] Francis v. Flinn, 118 U.S. 385, 6 S. Ct. 1148, 30 L.Ed. 165.

[8] "Who steals my purse steals trash;

But he that filches from me my good name

Robs me of that which not enriches him

And makes me poor indeed."

Othello, Act III, Scene 3.

[9] Smith, Disparagement of Property, 13 Columbia Law Review 13, 121.

[10] " * * * It is probably still true

There was not entire agreement on two points, the always technical and confusing conception of malice and the matter of special damage. The learned professor takes the position that in disparagement of quality the rival competitor is not entitled to the qualified privilege of the rival claimant for title and so malice need not be shown in forfeiture thereof.[11] The same view seems implicit in the Restatement of Torts[12] and it is interesting to observe that the more modern codes of business ethics follow the French and German law in proscribing all forms of truthful disparagement.[13] It may be that allegation and proof of special damage is necessary for a common-law recovery,[14] although even here one notices a relaxation[15] particularly where the trade libel includes assertions of unethical business conduct.[16] The very purpose of the equitable remedy indicates that there is no need for applying any such rigid rule to that side of the court.[17] In the case at bar, however, the learned court acted at a stage in the proceedings whereat such considerations are not before us. In dismissing the complaint, he takes two allegations as true and so is bound by the assertions of malice and loss of sales in paragraphs 29 and 32.[18]

If the common law has been the tortoise, equity assuredly has been the hare. This is the more surprising because equity came into existence for the exactly opposite reason. As one might also expect, the leading article on the judicial slothfulness in this field has been penned by another Harvard Law School professor. The learned Dean pulverizes the precedents and ends with the often quoted: "* * * Most of the cases that grant relief speak strongly of the injustice that must result from denial of jurisdiction in these cases. In substance the traditional doctrine puts anyone's business at the mercy of any insolvent malicious defamer who has sufficient imagination to lay out a skillful campaign of extortion. So long as denial of relief in such cases rests on

---

that unfair competition is a tort of that type where defendant has injured the plaintiff through the medium of the minds or influenced conduct of third persons." Unfair Competition: Property Rights As The Basis of Action, 12 Cornell Law Quarterly 416, 418 (note).

[11] Smith, Disparagement of Property, above cited, p. 139. He says: "But, on the other hand, a competing trader's omission to disparage the quality of his rival's goods does not involve the loss of his title to his own goods. By disparaging the quality of his rival's goods he may be enabled to sell his own goods to better advantage. But the possibility of his enjoying this benefit does not furnish a sufficient reason why the law should confer upon him prima facie protection in uttering disparaging statements, which turn out to be untrue in fact and which cause damage." P. 142.

[12] Restatement of Torts (1938) §§ 626, 628; cf. Bower, Code of Actionable Defamation, 2d Ed. 1928, pp. 134, 135.

[13] Annales de la Propriete, Industrielle (Annales) 1878, 331; Gesetz gegen den unlauteren Wettbewerb, Reichsgesetzblatt (1909) 499; cf. Isolfeu v. Wanner Cour d'Appel, Paris, 1934, Annales, 1934, 227, discussed in Alexandroff, Concurrence Deloyale (1935) No. 616–618; Reichsgericht II. Z. S. of January 5, 1938, MW 38, 142, 144.

[14] Smith, Disparagement of Property, above cited.

[15] Handler, Unfair Competition, 21 Iowa Law Review 175, 199.

[16] Torts: Corporations: Libel: Disparagement of Product or Business Methods, 13 Cornell Law Quarterly 136 (note).

[17] Trade Regulation—Remedy for "Disparagement" Amounting to Less Than Falsehood, 40 Columbia Law Review 341, 342–343 (note).

[18] "On information and belief, defendants have made the false, misleading and disparaging statements, claims and representations hereinabove alleged deliberately and maliciously with knowledge of the fact that such statements, claims and representations are not true and that they are contrary to the findings of the Federal Trade Commission with respect to the matters involved in the proceedings in which the defendant Association participated as above alleged and defendants have made such statements, claims and representations with intent to injure and to impair the credit and to destroy the competition furnished by plaintiffs, and all other dealers in Philippine mahogany." Complaint, Paragraph 29, Appendix to Plaintiffs-Appellants brief, pp. 11–12.

"As a result of the unfair and unlawful competition and in violation of the antitrust laws as above alleged, the reputation and good will of the plaintiffs have suffered loss and damage and plaintiffs have been injured in their business and property and have lost sales to which they were justly entitled." Complaint, Paragraph 32, Appendix to Plaintiffs-Appellants brief, p. 12.

no stronger basis than authority our courts are sure to find a way out." Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harvard Law Review 640, 668.

In view of this critic's eminence, it is not necessary to add much to his demolition of the reasons advanced for the Chancellor's hesitations. Later commentators have discussed them and have greeted with enthusiasm each decision which edges away from the traditional doctrine of negation.[19] The irrelevance of "free speech" and of "a libel is for a jury" are patent. Freedom of discussion of public issues does not demand lack of "previous restraint" for injury to private individuals. Disparagement of goods presents no confusing or complicated matter of personality requiring the sympathetic attention of one's peers.

■ We are quite willing to repudiate the "waning doctrine that equity will not restrain the trade libel".[20] We are further willing to do so directly and without hiding behind the other equitable principles put forward in some of the cases.[21] In so doing we may well repeat the words of a leading writer: "What does it really matter whether old customers are in-duced not to carry out their obligations or new customers are persuaded by unfair means not to enter into contractual relations? One practice is as unfair as the other, and in both cases the growth and success of the plaintiff's business are seriously affected." Derenberg, Trade-Mark Protection and Unfair Trading, p. 143.[22] Furthermore, we are satisfied that we have ample support in the better reasoned cases.[23]

■■ The views just expressed make it unnecessary for us to elaborate upon plaintiffs' failure to state a cause of action under the Sherman or Clayton Acts.[24] We quite agree with the learned district judge in that respect. The vital allegations in such an action are similar to those in any civil conspiracy case. A general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action. Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment.[25] The plaintiffs have pleaded none of these facts. Neither the date of the alleged conspiracy nor its attendant circumstances

[19] Nims, Unfair Competition by False Statements or Disparagement, 19 Cornell Law Quarterly 63; Price-Maintenance Practices as "Unfair Methods of Competition" Under the Federal Trade Commission Act, 75 University of Pennsylvania Law Review 248 (note); Trade Regulation—Remedy for "Disparagement" Amounting to Less Than Falsehood, 40 Columbia Law Review 341 (note); Has Equity Jurisdiction to Enjoin Publication of a Libel?, 12 Iowa Law Review 77; Disparagement of Goods as Trade Libel, 6 North Carolina Law Review 72 (note).

[20] Trade Regulation—Remedy for "Disparagement" Amounting to Less Than Falsehood, 40 Columbia Law Review 341 (note), above cited.

[21] These are breach of trust, coercion, boycott, or "plan and scheme" and "conspiracy", such as is alleged in paragraphs 30 and 31 of the complaint in the case at bar.

[22] The trend has been described: "The law of unfair competition has developed and is still developing primarily as a judicial reaction against unfair trade practices. Its evolution is as yet far from complete; a survey of recent cases clearly indicates its state of flux. Coupled with decisions upon which precedent and judicial inertia have exerted a re-tarding influence are many others which show a distinctly liberal and progressive approach. These cases, together with the increasingly important work of administrative agencies and an awakening legislative interest, reveal an unmistakable trend towards greater insistence upon the application of ethical standards to business." Developments in the Law—Unfair Competition, 46 Harvard Law Review 1171.

And our decision prophesied: " * * * Probably it is safe to say, from the recent trend of decisions on this subject in this country, that some court will soon take advantage of the opportunity here presented to discard this indirect and unsatisfactory approach and blaze a trail direct to the heart of this problem." Disparagement of Goods as Trade Libel, 6 North Carolina Law Review 72, 73.

[23] Maytag Co. v. Meadows Mfg. Co., 7 Cir., 35 F.2d 403; Alliance Securities Co. v. De Vilbiss, D.C., 24 F.2d 530; Rollman Mfg. Co. v. Universal Hardware Works, 3 Cir., 238 F. 568; and see other cases discussed by the commentators noted in footnote 19 above.

[24] 15 U.S.C.A. § 1 et seq.; 15 U.S.C.A. § 12 et seq.

[25] Baylies, Pleading (3d ed. 1929) pp. 56, 311–313; Bates, Pleading, Practice, Parties and Forms, 4th Ed. 1932, § 1161.

are set forth. Nor is it averred who make the statements, where, when, or to whom.

The order dismissing the complaint is reversed, and the cause remanded for further proceedings in accordance with this opinion.

On Rehearing.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

We think that it is unnecessary upon rehearing to discuss at length the conclusion of the learned trial judge that the complaint as drawn fails to state a cause of action under the Sherman or Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 and historical note, 15 U.S.C.A. § 12 et seq. In our first opinion we concurred in this view and we see no reason now to change our conclusion. As to the question of whether or not the plaintiffs have set forth a cause of action sounding in unfair competition, we shall deal later in this opinion. In our original opinion we decided that in Delaware a cause of action for trade libel or disparagement of goods might be maintained without regard to the existence or non-existence of civil conspiracy or unfair competition. Having some doubt as to the correctness of our decision on this point, we ordered rehearing. We shall endeavor to dispose of all the issues which we deem pertinent to the case at bar but we shall devote the first part of this opinion to the question of whether a "pure" trade libel, that is to say a trade libel without any element of unfair competition or civil conspiracy or other aid to equitable jurisdiction, may be enjoined.

The pleadings in the case are set out fully in the opinion of the court below. See D. C., 34 F.Supp. 450. It will be necessary to read that opinion in order to understand what we are about to say for we shall recapitulate the facts only to a limited degree.

In paragraph 23 of the complaint the plaintiffs allege that in pursuance of a conspiracy the defendants and others have made and will continue to make false and unfair statements inter alia with respect to the word "mahogany" and to the phrase "Philippine mahogany"; that these statements were made with the intention of disparaging the plaintiffs and their merchandise and bringing them into disrepute, thereby decreasing the plaintiffs' business and increasing the business of the defendants. These allegations are amplified by a bill of particulars setting up more than a score of ways in which it is alleged that the defendants have libeled the plaintiffs' woods. The items of the bill of particulars are set up in full in the opinion of the court below and we need not repeat them. The whole of the libel can be summed up by saying that the plaintiffs allege that the defendants tell the trade and the public that the woods the plaintiffs sell are not mahogany at all and that a dealer who sells Philippine woods as mahogany is unethical.

The plaintiffs seek an injunction to prohibit these alleged libels. The defendants have moved to dismiss the complaint. Since the commencement of the suit at bar there has been pending before the Federal Trade Commission the question of whether or not the term "Philippine mahogany" as used by the plaintiffs is deceptive. If the Commission holds that the use of the term is deceptive the Commission may prohibit the plaintiffs from using it. See Federal Trade Commission Act, § 5, 15 U.S.C.A. § 45. The plaintiffs could not then maintain their action in any court. They could seek review of the order of the Commission in the manner prescribed by Section 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c). These facts were referred to in the opinion of the court below and were touched on in our original opinion. It is not necessary to go into greater detail here.

The defendants allege that the suit at bar cannot be maintained because the law of Delaware will not authorize the enjoining of a continuing libel. It is upon this point that the defendants place their greatest reliance. The defendants contend that the rule of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 applies in the case at bar. It does so far as concerns substantive law, but we think it preferable to discuss the application of the rule of that case to the facts at bar at a later stage of this opinion. The rule enunciated by the Supreme Court in Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477, must be discussed first. That ruling is to the effect that in diversity of citizenship cases, and the case at bar is a diversity case in view of the fact that the complaint states no cause of action arising under the anti-trust laws of the United

States, a federal court must follow the rule of conflicts of the state in which it sits. The conflict-of-laws rule of Delaware is that in the case of torts substantive rights are governed by the law of the jurisdiction where the wrong occurs. Skillman v. Conner, 8 W.W.Harr. 402, 193 A. 563. The Delaware rule is the usual rule applied in most of the states. See Restatement of Conflict of Laws, Introductory Note immediately before Section 584 and Sections 378, 379; Goodrich, Conflict of Laws, 2d Ed., Sec. 77; and 3 Beale, Conflict of Laws, Sec. 584.1. But the complaint is silent as to where the alleged libels took place. From paragraphs 18 and 19 of the plaintiffs' bill of particulars it appears that Mahogany Association, Inc., a New York membership corporation, published the libel. Where it did so is not stated. We cannot deem these omissions to be matters of great consequence at this stage of the case for a right of action for trade libel is granted almost universally to the owner or vendor of the goods when he has suffered injury. We know of no jurisdiction in the United States in which trade libel or disparagement of goods will not create a cause of action. We think that in the absence of allegations as to the place or places where the acts complained of occurred, the court below would have been entitled to assume that these operative facts took place within the State of Delaware. As to substantive rights the cases are clear that the rules of substantive law to be applied in a federal equity court in a diversity case are those which would be applied in a state court sitting in the same state. This is a logical and indeed necessary extension of the principle of Erie R. Co. v. Tompkins, supra. See Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290; New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329, and Rosenthal v. New York Life Insurance Co., 304 U.S. 263, 58 S.Ct. 874, 82 L.Ed. 1330. Nothing contained in Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, or in West v. American T. & T. Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L.R. 956, indicates the contrary.

■ There is no doubt that the substantive law of Delaware gives the person who has received legal injury a right of action for trade libel or disparagement of goods. The question which we must decide therefore may be stated as follows: What is the remedy which may be granted in the

District Court of Delaware? In Sprague v. Ticonic Bank, 307 U.S. 161, 164, 165, 59 S. Ct. 777, 779, 83 L.Ed. 1184, the Supreme Court by Mr. Justice Frankfurter, held, following earlier decisions, including Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260, that "The suits 'in equity' of which these courts [of federal equity jurisdiction] were given 'cognizance' ever since the First Judiciary Act, 1 Stat. 73, constituted that body of remedies, procedures and practices which theretofore had been evolved in the English Court of Chancery, subject, of course, to modifications by Congress, e.g., Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451." We think that this must be deemed to be an indication from the Supreme Court that in so far as equitable remedies are concerned federal courts are to grant them in accordance with their own rules which have been developed out of the English Chancery practice. The words of Mr. Justice Frankfurter in the Ticonic Bank case are a plain indication that the rule enunciated in Payne v. Hook, supra, 7 Wall. page 430, 19 L.Ed. 260, "The equity jurisdiction conferred on the Federal Courts is the same that the High Court of Chancery in England possesses; is subject to neither limitation or restraint by State legislation, and is uniform throughout the different States of the Union", is the law so far at least as the granting of equitable remedies is concerned. The rule of Erie R. Co. v. Tompkins being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law.

■ Little help upon the specific subject of enjoining "pure" trade libels can be gotten from the law of England as it was at the time of the severance of the Colonies from the mother country. We use the word "pure" in connection with trade libels to describe those types of trade libels which are committed under circumstances which will not serve as the basis of some well-established form of equitable relief. This is discussed more fully at a later point in this opinion. There is, however, a single applicable case on the subject of enjoining a trade libel decided by the Circuit Court, District of Delaware. In Edison v. Thomas A. Edison, Jr., Chemical Company, 128 F. 957, decided by Judge Bradford in 1904, Thomas A. Edison brought a bill against the Thomas A. Edison, Jr., Chemical

Company alleging that the company was selling Wizard Ink Tablets and Magno-Electric Vitalizers by the fraudulent use of the name Edison. The bill stated that the company was deceiving the public and injuring the complainant's reputation as an inventor by passing-off ink tablets and vitalizers as the complainant's inventions, he being in nowise connected with their manufacture and sale, the articles being worthless. The complainant sought an injunction. In his opinion Judge Bradford stated, 128 F. at page 963, "The case now in hand, being one merely of libel or defamation of business reputation unaccompanied by threats, intimidation or coercion, or by any direct attack upon property or conduct of business, or by any direct or indirect creation of liability on the part of the complainant, is not within the equitable jurisdiction of this court. While the decisions are somewhat inharmonious, I am satisfied by an overwhelming weight of authority that this court has no jurisdiction to enjoin the publication of a mere libel or slander, and, consequently, no authority to grant the relief prayed." Judge Bradford then cited a number of cases including Marlin Firearms Co. v. Shields, 171 N.Y. 384, 64 N.E. 163, 59 L.R.A. 310, and stated that he found nothing in Lewin v. Welsbach Light Company, C.C., 81 F. 904, inconsistent with his conclusion.

The learned judge did not discuss the provisions of Section 5 of Article I of the Constitution of Delaware of 1897 which provides, "The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty." The defendants rely strongly upon this constitutional provision. We cannot doubt that Judge Bradford was aware of the words of Section 5 for he was a member of the Convention that drew up that Constitution and he took a leading part in its deliberations. The substance of Section 5 of Article I has been in every Constitution of Delaware since that State ratified the Constitution of the United States. See Section 5, Article I of the Constitutions of 1831 and of 1792. Judge Bradford was a strong constitutionalist. Since he made no reference to Section 5 of Article I of the Constitution of Delaware we think that he must have deemed it to be inapplicable.[1] We agree with his conclusion in view of the distinction hereinafter discussed, between trade libels and those personal defamations to which the constitutional provision was in fact directed.

It is interesting and pertinent to note how the courts of chancery have handled questions of trade libel. In an article, "Unfair Competition by False Statements or Disparagement" in 19 Cornell Law Quarterly, pp. 63, 64, Mr. Nims quotes with approval from an article by Dean Roscoe Pound, "Equitable Relief Against Defamation and Injuries to Personality", 29 H.L. R. 640 et seq., as follows, p. 668: "Looking back over these cases of injury to person or property by writing and publishing, we see that the English Courts now deal with them as with any other torts; that in England the subject has had the

---

[1] It is interesting to note that the Court of Chancery of Delaware has not construed the constitutional provision as the defendants would have us construe it. The case of Liberty Life Assurance Society v. Heralds of Liberty, 15 Del. Ch. 369, 138 A. 634, is typical. In this case Liberty Life Assurance Society filed its bill to prevent the pirating of its former name. The Chancellor stated, page 378 of 15 Del.Ch., page 638 of 138 A., "The choice of its [the complainant's] named by the incorporators of the defendant company appears to have been for the unlawful purpose of unfairly competing with the complainant in its business, and of wrongfully profiting at its expense." The injunction was granted to prevent unfair competition, viz., the use of a name by the defendant. In Sellers v. McCormick, 19 Del.Ch. 238, 165 A. 569, the Court of Chancery protected both trade name and good will. Sellers was the receiver for McCormick Bros. Upon the discharge of the partners by the receiver they began to compete with him. They announced the opening of a "New home of McCormick Transportation Company" and thanked "Our old customers for their continued patronage." Under a literal construction of Section 5 of Article I of the Delaware Constitution, such publications by the McCormicks could not have been enjoined. The Chancellor, however, had no hesitancy in issuing an injunction for the protection of the receiver and creditors. Freedom of publication at this point gave way to protection of property. The Sellers case was decided in 1933. See also American Radio Stores, Inc., v. American Radio & Television Stores Corp., 17 Del.Ch. 127, 150 A. 180.

very same development as equity jurisdiction over trespass, over disturbance of easements, and over nuisance. We also see that American Courts are moving in the same direction, reaching such cases indirectly by laying hold of some admitted head of equity jurisdiction and tacking thereto what is in substance concurrent jurisdiction over legal injuries through publication. In some of the cases this is so obviously but a matter of pleading that we may be confident some strong court presently will take the direct course and will be followed therein. Most of the cases that grant relief speak strongly of the injustice that must result from denial of jurisdiction in these cases. In substance the traditional doctrine puts anyone's business at the mercy of any insolvent, malicious defamer who has sufficient imagination to lay out a skillful campaign of extortion. So long as denial of relief in such cases rests on no stronger basis than authority our courts are sure to find a way out."

Mr. Nims goes on to say, "In the sixteen years since this [Dean Pound's article] was written apparently no 'strong court' has been willing to 'take the direct course', but some of our courts have further cleared the way for an outright declaration that defamation or disparagement of a competitor's goods is unfair competition and a proper subject of injunctive relief." He then cites the so-called "So-Bos-So" case, Allen Manufacturing Co. v. Smith, 224 App. Div. 187, 190, 229 N.Y.S. 692, 696, 4th Dept. 1928. In this case the alleged existence of passing-off and trade-mark infringement was rejected by the court which none the less enjoined the false disparagement of the plaintiff's product. The court noted that actions for unfair competition are not confined to the passing-off cases and distinguished the leading New York cases upon the ground that they were not cases of unfair competition but suits against the publishers of libels. This decision was a

decided step from Marlin Firearms Co. v. Shields, 171 N.Y. 384, 64 N.E. 163, 59 L. R.A. 310. Mr. Nims also refers to the case of Robert E. Hicks Corporation v. National Salesmen's Training Association, 19 F.2d 963, in which the Circuit Court of Appeals for the Seventh Circuit, while expressly acknowledging the rule that a trade libel could not be enjoined in and of itself, did say by way of dictum that an injunction might issue to prevent the furtherance of a conspiracy to induce a breach of contract. Allen Manufacturing Co. v. Smith, supra, and Old Investors & Traders Corporation v. Jenkins, 133 Misc. 213, 232 N. Y.S. 245, also are cited in the Nims article, but neither of these cases directly overrules the earlier decisions though in the case last cited a non-competing publisher was enjoined from publishing a trade libel. The Old Investors & Traders Corporation case does support the plaintiffs' position. It is the only case which we have been able to find where the enjoining of a trade libel was not fastened on some well-established hook of equitable relief.

■ But the phrase "pure trade libel" has been called a misnomer which has resulted in ascribing to this tort the legal attributes of libel and slander, particularly the inherent characteristics of defamation, and in the consequent application of the dogma that a court of equity will not enjoin a continuing libel or slander.[2]

There is a clear line of demarcation between the two torts which is often overlooked. The first is concerned with interests of personality, the other with interests in property.[3] Thus, the Restatement classifies libel and slander as "Defamation", "Invasions of Interest in Reputation", and trade libels as "Disparagement", "Invasions of Interests in the Vendibility of Property by Disparagement."[4] A judicial consciousness of this distinction and the consequent attendant differences in legal incidents[5] would avoid the "confusion" "it

[2] Prosser, Handbook of the Law of Torts (1941) pp. 1036–1040, p. 1037: "Because of the unfortunate association with 'slander,' a supposed analogy to defamation has hung over the tort like a fog, concealing its real character, and has had great influence upon its development. The plaintiff's title or property seems to have been regarded as somehow personified, and so defamed. One important consequence has been that many courts have applied to disparage-

ment the rule that equity in the interests of freedom of speech, will not enjoin the publication of libel or slander." See, also, Jeremiah Smith's illuminating discussion, "Disparagement of Property" (1913) 13 Col.L.Rev. 13, 121, pp. 127–132.

[3] Smith, supra at p. 127; Prosser, supra at p. 1040.

[4] 3 Restatement, Torts (1938) chs. 24 and 28; § 573, comment g.

[5] The differences in the two torts are

[trade libel] has lead to" and "The application of false analogies. Or more specifically the failure to realize that the action for disparagement of property has a place of its own in the law; and is not a mere branch, or special variety, of the action for defamation of personal reputation or of the action for deceit."[6]

Assuming that the plaintiffs here have pleaded nothing more than an action for disparagement of goods, that is to say, a "pure" trade libel, and although under certain circumstances such a libel may also constitute a defamation of the owner,[7] so as to bar equitable relief, that obstacle does not confront us in the case at bar. The need for granting equitable relief in cases like the present, where there are involved genuine proprietary interests of great social and commercial significance to the parties affected, is urgent. Dean Pound's characterization of the evils to be avoided is convincing proof of this, as are the numerous cases where such relief was sought. In the latter instances, injustice often has been avoided, as we have indicated, by casting for and hooking onto a remote but allegedly independent basis for equitable relief.[8]

■ In the case at bar we are not required to depart from severely criticized precedent. The District Court found that there was no competition between the woods of the plaintiffs and those of the defendants and that therefore there could be no competition. We think that the learned District Judge took too narrow a view of this question and that actually the woods of the plaintiffs and those of the defendants are in competition. The issue of unfair competition was not clearly disposed of in our first opinion. We conclude now that the allegations of the complaint viewed in the light of Rule 8 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, are sufficient to support a charge of unfair competition committed pursuant to the joint acts of the defendants and others. The courts of the United States have granted the remedy of an injunction under such circumstances. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 436, 437, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874; American Malting Co. v. Keitel, 2 Cir., 209 F. 351, 357, 358; Gerosa et al. v. Apco Mfg. Co., 1 Cir., 299 F. 19, 26; Emack v. Kane, C.C., 34 F. 46, 50; Nims, The Law of Unfair Competition and Trade Marks, 3d Ed., 1929, Section 263, et seq. Cf. Procter & Gamble Co. v. J. L. Prescott Co., 3 Cir., 102 F.2d 773. Except for a technical defect in the pleading the plaintiffs in the case at bar have stated a cause of action which is the basis for the equitable relief sought by them.

■ We will discuss that technical defect now. The defendants assert that the court below was without jurisdiction of the controversy because the jurisdictional amount was not properly alleged in the complaint. The complaint alleges that "the matter in controversy exceeds, exclusive of interest and costs, the sum of $3,-000 * * *". It does not allege that each of the three plaintiffs incurred damages in that sum. There is nothing in the complaint which indicates that it is a true class action. It is obviously a spurious class suit. See Rule 23(a) (3) of the Federal Rules of Civil Procedure. While the plaintiffs can join in one suit they may not aggregate their claims in order to arrive at the jurisdictional amount. The claim of each plaintiff is separate and distinct. See Pinel v. Pinel, 240 U.S. 594, 36 S.Ct. 416, 60 L.Ed. 817; Lion Bonding & Surety Co. v. Karatz, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871; Independence Shares Corporation v. Deckert, 3 Cir., 108 F.2d 51, 53, reversed on other grounds 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189. It follows that since no cause of action is stated under the antitrust laws of the United States, the jurisdictional allegations in the complaint are insufficient and the complaint as drawn must be dismissed unless timely and proper amendment be made in accordance with Rule 15(a). It should be stated, however, that so far as the record before us shows, this question of the sufficiency of allegations as to jurisdictional amount was not raised in the court below and was not raised in this court until argument upon rehearing. This makes no difference. The question of jurisdiction is always open. It has been raised before us on the argument on

---

listed in: Smith, supra, pp. 127–132, Prosser, supra, 1041, 1042. 3 Restatement, Torts (1938) p. 323.

[6] Smith, supra, pp. 13, 14.

[7] Prosser, supra, 1038; 3 Restatement, Torts (1938) § 573, comment g.

[8] Prosser, supra 1038 and note 3. Pound, Equitable Relief Against Defamation and Injuries to Personality, supra, p. 668.

rehearing. This court, however, could consider the question upon its own motion. Without the necessary jurisdictional allegations, the complaint cannot be maintained. See Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338.

We have considered carefully the motion of the plaintiffs to strike certain sentences from our original opinion and substitute other words in their place. The reasons why the Federal Trade Commission reopened the controversy between these parties are best known to the Commission and not to ourselves. The motion will be denied.

The plaintiffs' motion to strike out the document entitled "Relevant Portions of Record in the 'Philippine Mahogany' Case" will be granted for this document was not before the District Court. We will not strike out those portions of the defendants' brief which deal with this document. Briefs are not part of the record.

The judgment of the court below is reversed and the cause is remanded with the direction to the court below to allow the plaintiffs a reasonable opportunity for amendment of the complaint in accordance with the provisions of Rule 15(a) of the Federal Rules of Civil Procedure.

Circuit Judge CLARK took no part in the decision in this case on rehearing.