## CHICAGO PNEUMATIC TOOL CO. v. ZIEGLER.

· No. 9493.

District Court, E. D. Pennsylvania.

Feb. 10, 1943.

Lawrence Bristol, of New York City, and W. Heyward Myers, Jr., of Philadelphia, Pa., for plaintiff.

Joseph G. Denny, Jr., of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a civil action for declaratory judgment brought by the petitioner, the Tool Company, for a determination of the term of two contracts between it and Charles H. Haeseler, to whose rights the respondent has succeeded. The respondent has filed a counterclaim for damages, representing minimum royalties alleged to be due under the contracts, which are patent license agreements: Exhibit 1, executed January 27, 1919, and Exhibit 2, executed January 27, 1921. The former obligates the Tool Company to pay to Haeseler minimum royalties of $10,000 for its term.

There are three questions which must be answered:

A. Does the obligation to pay minimum royalties extend for the duration of patents licensed under Exhibit 2 as well as those licensed under Exhibit 1?

B. Does the obligation to pay minimum royalties extend to the end of the term of the last expiring patent licensed under paragraph 10 of Exhibit 1?

C. By what patent is the term to be measured?

■ A. There is no provision in the second contract whereby it specifically changes the duration of the first. It gives the Tool Company a license under two specifically mentioned patent applications (paragraph 1) and "any tools, machines and devices that may be invented by the Licensor during the continuance of the said agreement (the first contract) between the Licensor and Licensee dated the 27th day of January, A. D., 1919, subject to the terms of that agreement." (Paragraph 2.) Although the contracts might have been more plainly phrased it is clear from the two, read together, that the second was intended to extend the provisions of the first to the two specifically mentioned patent applications and to "any tools, machines and devices that may be invented," etc., and imposed the obligation to pay the minimum royalty of the first contract for the duration of patents so included.

■ B. A word by word discussion of the first contract would probably not help to clarify it. Again, however, the whole contract manifests the intention that the obligation to pay royalties shall cover the whole term of any patent comprehended by paragraph 10.

C. The obligation to pay royalties thus expires:

July 5, 1944—if 1,634,780 is within paragraph 10, Exhibit 1.

April 15, 1942—if the term of Belgian patent 274,347 extends to that date.

January 29, 1941—if 1,481,865 comes within either paragraph 10, Exhibit 1, or paragraph 1, Exhibit 2.

March 22, 1938—if 1,372,348 comes within paragraph 10, Exhibit 1, or paragraph 2, Exhibit 2.

April 30, 1936—the date on which petitioner ceased paying royalties—if Canadian 183,912 was the last licensed patent to expire.

Discussing these possibilities in order:

'780 and Paragraph 10, Exhibit 1.

■ The application for '780 was filed Oct. 23, 1920, prior to the execution of the second contract, Jan. 27, 1921, but was not mentioned in it. In view of the specific enumeration of patent applications in the preamble, and of the fact that paragraph 2 is distinctly in the future tense ("devices that may be invented"), it is evident there was no intention that this invention be covered by the second contract.

The question, then, is whether '780 (having been applied for after the date of Exhibit 1) comes within the terms of paragraph 10 of Exhibit 1.

Paragraph 10 provides " * * * Licensor further agrees that in the event of his * * * obtaining * * * Patents relating to improvements in the tools * * * manufactured and sold by virtue of this agreement, he will grant" (a license) "under the terms heretofore set forth; providing * * * Licensee, upon indication of its desire to use said * * * improvements, shall pay all expenses * * * in connection with the applications * * *."

Considerable testimony and argument have been directed to the question whether '780 is an improvement (within the meaning of paragraph 10) upon the "Hummer Drill." I find that it is not. One of the clearest indications of this is the failure of the patentee even to suggest in his patent that it might be applied to a drill. His efforts had for a long time been directed to the conception and improvement of such tools. It is certainly most unlikely that he would have failed to see the usefulness of any invention of his in connection with drills had it in fact had any.

It is admitted that '780 was an improvement upon the Haeseler ball valve pneumatic hammer—a device which, of course, could not by any stretching of the meaning of words be properly called a drill. However, paragraph 10 by its terms operates only on improvements in the tools "manufactured and sold by virtue of this agreement." There is very little evidence that any of the Haeseler ball valve pneumatic hammers were "sold" at any time. The provision, "by virtue of this agreement," obviously requires that sales, in order to bring paragraph 10 into operation, must be subsequent to the execution of the agreement, January 27, 1919. The evidence relating to transactions involving the hammer after this date shows no sales. Summarized, it is as follows:

February 12, 1919: 12 hammers were "furnished for service," but this was merely an intracompany transaction.

February 20, 1919: There was evidence that Great Lakes Shipyard placed an order for one hammer. However, no price was proved nor was there any evidence that the transaction culminated in a completed sale.

February 28, 1919: Another shipyard requested that the Tool Company make an offer to take off its hands 1300 old hammers and replace them with the Haeseler hammers. Far from indicating a completed sale there is no showing in this connection that there was even an offer, the first requirement of a contract.

March 6, 1919: One hammer was picked up from the Mathis Shipyard which had been left there for trial two years before.

It is thus evident that '780 does not come within paragraph 10.

### Belgian '347

■ The Belgian patent is specifically licensed (under its application number) in Exhibit 1. Under the Belgian Act of May 24, 1854 its duration would normally be 20 years, and it would normally expire November 6, 1934. The respondent, however, argues that the term of the patent was extended some seven years more by the Belgian Act of October 11, 1919. This benefit under this Act, however, is specifically limited "as regards foreigners, to subjects of countries which have accorded to Belgian subjects privileges which have been recognized as equivalent by Royal Decree published in the Moniteur Belge." No such Royal Decree in connection with the United States has been brought to the attention of the Court, and it is difficult to see how such express language, under the interpretation of the Courts of any country, could mean anything other than that the Act did not apply to American owned patents and did not extend the term of Haeseler's Belgian patent.

### '865 and Paragraph 1, Exhibit 2.

The application for '865 was specifically mentioned in the preamble of Exhibit 2, and in paragraph 1 of that agreement the licensee was granted "the exclusive right to make, use and sell the * * * inventions described and claimed in the aforesaid applications for Letters Patent * * * subject to the terms and conditions of said license agreement (Exhibit 1)." Thus it is clear that the obligation to pay royalties extended to January 29, 1941, when this patent expired, and it is not necessary to inquire whether it was within the purview of paragraph 10, Exhibit 1.

### The '348 Patent.

■ The application for this patent was filed on August 15, 1916, two years prior to the execution of the first contract. Though the patent did not issue until March 22, 1921 it is apparent that it could not come within either of the agreements. It was not mentioned specifically in either agreement and consequently must be presumed to have been intentionally excluded.

An order for judgment in accordance with the foregoing opinion may be submitted.

### Answers to Requests
### Petitioner's

Findings of fact:

1 to 8, inclusive. Affirmed.

9. Not answered as immaterial.

10. Affirmed.

11. Not answered because immaterial in view of the affirmance of 12.

12. Affirmed.

13. Not a proper subject for a request and is not answered.

14 and 15. Affirmed.

16, 17 and 18. These requests state the facts correctly and will be affirmed, but I am of the opinion that they are immaterial.

19 and 20. Affirmed.

21. Not answered. Matters of record need not be included in requests for findings.

22. Affirmed.

23 and 24. Affirmed, but immaterial in view of the conclusions reached in the opinion.

25, 26 and 27. Affirmed.

28. Affirmed but modified by the finding that they were never sold after the execution of Exhibit 1 and consequently never sold "by virtue of" Exhibit 1.

29 and 30. Affirmed.

31. Not answered as immaterial. This patent was specifically mentioned in Exhibit 2 and consequently it is immaterial whether or not it was an improvement.

32 and 33. Affirmed.

34 and 35. Affirmed, but immaterial.

36 to 40, inclusive. Immaterial and not answered.

41 and 42. Affirmed.

Conclusions of Law:

1. Affirmed.

2. Modified to read as follows, and, as so modified, affirmed: "Under the agreement Exhibit 1 Charles H. Haeseler granted no rights to the petitioner with respect to U. S. patent No. 1,372,348. The omission of any reference to the application for this patent from the first Whereas clause of the agreement, though the application was then on file, excludes it from the license granted to the petitioner by Paragraph 2 of the agreement under 'the aforesaid Letters Patent and applications.' This patent is not comprehended within Paragraph 10 of the agreement concerning improvements, because Paragraph 10 refers only to patents applied for and obtained subsequent to the execution of the agreement, whereas patent No. 1,372,348 was applied for more than two years prior thereto."

3 to 9. Inclusive. Affirmed.

10 to 15, inclusive. Denied

Respondent's Findings of Fact:

1 to 15, inclusive. Affirmed.

16 and 17. Immaterial and not answered.

18 and 19. Affirmed.

20. Immaterial and not answered.

21 and 22. Denied.

23 to 31, inclusive. Affirmed.

32. Affirmed, with the modification that this was merely an intracompany transaction.

33. Affirmed. However, no price was proved nor was there any evidence that the transaction culminated in a completed sale.

34. Affirmed. However, far from indicating a completed sale there is no showing that there was ever an offer, the first requirement of a contract.

35 to 37, inclusive. Not answered as immaterial.

38 to 41, inclusive. Affirmed.

42. Not answered as immaterial.

43. Denied.

44. Affirmed.

45. Affirmed but immaterial because of the finding that this patent was intentionally excluded from Exhibit 2.

46. Affirmed when modified to read as follows: "Charles H. Haeseler applied for and obtained Letters Patent No. 1,481,-865 granted Jan. 29; 1924." The balance of the request is immaterial in view of the fact that, as pointed out in the opinion, '865 was specifically licensed under Exhibit 2 by reference to its application number.

47 to 51, inclusive. Denied.

52. Not answered as immaterial.

53. Affirmed.

54. Not answered as immaterial.

55. Affirmed.

56. Affirmed but this is no indication that '780 was considered by the Tool Company to be an improvement on rock drills. It was concededly an improvement on the riveting hammer.

57. Affirmed, when the last clause is modified to read as follows: " * * * under the provisions of the Belgian Law of May 24, 1853." The Act of October 11, 1919 is inapplicable.

58. Affirmed.

59. Affirmed, when modified to read as follows: "The International Convention for the Protection of Industrial Property

150

signed at the Hague in 1925, and proclaimed by the President of the United States in 1931, provides 'Nationals of each of the contracting countries shall in all other countries of the Union, as regards the protection of industrial property, enjoy the advantages that their respective laws now grant, or may hereafter grant, to their own nationals, without any prejudice of the rights specially provided by the present convention.' "

*Note*: It is difficult to see the materiality of this Convention and its recognition by the United States Government. The condition of Sec. 14 of the Belgian Law of October 11, 1919 requires a royal decree published in the Moniteur Belge recognizing reciprocity. No such decree has been brought to the attention of the Court. The decree of 1921 relates particularly to the "law adopted by the Congress of the United States of America on March 3, 1921," the Nolan Act, 35 U.S.C.A. §§ 80–87, and obviously has nothing to do with the Convention of 1925. It would appear from the opinion of the Brussels Tribunal, Dec. 15, 1931, in the United States Hoffman Machinery Corporation case, that, up to that date, no decree satisfying the condition of Article 14 had been published in the Moniteur Belge.

60. Denied.

61. Affirmed when modified to read as follows: "Reciprocity in connection with the rights granted by the Nolan Act was previously established between the Law of Belgium and the Law of the United States by the Nolan Act of 1921 and a decree recognizing reciprocity published in the Moniteur of 1921."

*Note*: See note to 62 below.

62. Affirmed.

■ *Note*: The notice published by the Commissioner of Patents on Oct. 20, 1921 executed the condition of the decree in the Moniteur mentioned in request 61: "This application is subject to the condition that Belgian subjects shall be granted the advantages of the law adopted by the Congress of the United States of America on March 3rd 1921, on the same matter." The

most important right in connection with which reciprocity was established by the Belgian decree and the Commissioner's notice of 1921 would seem to be in connection with extension of priority rights as established by Sec. 1 of the Nolan Act and Article 8 (and perhaps 10) of the Belgian Law of Oct. 11, 1919. It appears to me that the reciprocity contemplated by these laws as a condition of their applicability to citizens of foreign countries is not a general reciprocity, but rather the extension by the foreign country to citizens of the United States of particular rights substantially equivalent to the rights granted by the particular law. Thus the condition of the Nolan Act in this connection has been construed to mean that the privileges extended by the foreign country must be "substantially reciprocal to the privileges granted by the Nolan Act." Owen v. Heimann, 56 App.D.C. 232, 12 F.2d 173, 174. I know of no grant by the United States to its own citizens or any others of an extension of the duration of patents such as is the subject matter of Article 13 of the Belgian Law of Oct. 11, 1919.

63. Affirmed.

64. Denied.

65. Immaterial and not answered.

66. Affirmed when modified to read as follows: "The term of the contract from January 27, 1919 as supplemented by the agreement of January 27, 1921, expired January 29, 1941, and there is due to the respondent a minimum royalty of $10,000 for each and every year of the term of said contract as supplemented from May 1, 1936 to that date, with interest on each monthly installment of $833.34 from the date such installment became due."

Conclusions of Law:

1. Affirmed.
2. Not answered.
3. Affirmed.
4. Affirmed.
5 to 8, inclusive. Denied.
9. Affirmed.
10. Denied.