## CHICAGO PNEUMATIC TOOL CO. v. ZIEGLER.

### Nos. 8453, 8454.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 7, 1944.

Reargued May 18, 1945.

Decided Aug. 20, 1945.

---

Lawrence Bristol, of New York City (Morgan, Lewis & Bockius and W. Heyward Myers, Jr., all of Philadelphia, Pa., on the brief), for appellant.

Joseph G. Denny, Jr., of Philadelphia, Pa., for cross-appellant.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

Charles H. Haeseler, an inventor, for some years prior to 1919 had been an employee of the petitioner, Chicago Pneumatic Tool Company. On January 27, 1919 Haeseler entered into an agreement with the Tool Company cancelling certain prior patent-licensing contracts entered into by him with his employer. The new contract listed certain patents and a number of pending patent applications owned by Haeseler. Included in these was an application, No. 6,269, for Letters Patent of Belgium. By the terms of the agreement Haeseler granted to the Tool Company the exclusive right to *make* and *sell* the tools, machines and devices disclosed in the patents and applications " * * * to the full end of the terms for which said Letters Patent are or may be granted * * *." The right to *use* the machines and devices was not included in the license to the Tool Company. The Tool Company, as licensee, agreed to pay Haeseler in monthly installments on the first day of each calendar month a minimum royalty of $10,000 " * * * for each and every year during the term of this contract * * *." Another paragraph of the agreement stipulated that "during the term of the continuance of this contract" Haeseler should not engage in any competitive business, that the licensee should have the exclusive right to *make* and *sell* any and all improvements to "the tools, machines and devices manufactured and sold by virtue of this agreement" and that the licensee "upon the indication of its desire to use * * * [the] inventions and improvements" should pay all expenses incurred by Haeseler in connection with such improve-

ment patents. The contract stipulated also that the licensee should pay "any and all taxes and expenses of any kind whatever incident to the prosecution of patent applications and of keeping alive all Letters Patent" of the foreign countries named in the agreement. The contract also set up a schedule for the payment of royalties by the Tool Company to Haeseler for sales made of machines and devices embodying the inventions described in the patents and applications.

The Tool Company expressed dissatisfaction with this contract and on January 27, 1921, Haeseler and the petitioner executed another agreement. This, by its terms was "to be supplemental to and form a part of" the 1919 contract. In consideration of the payment to him of $2,000 "and of other valuable considerations moving between the parties" Haeseler granted the petitioner the exclusive right to *make, use* and *sell* the several tools and devices described in two pending applications for patents " * * * to the full end of the terms for which said Letters Patent may be granted * * * subject to the terms and conditions * * *" of the 1919 contract. The agreement also gave to the petitioner the exclusive right to make, use and sell any machines, tools and devices that might be invented by the licensor during the continuance of the 1919 agreement and subject to its terms, " * * * whether or not such tools, machines and devices be of the same class as * * * [those] referred to in * * * [the 1919 agreement], or be improvements thereon."

The minimum royalty, prescribed by the first agreement, with the possible exception of one instalment, was paid to Haeseler by the Tool Company, and after his death, to his widow, the original respondent herein, until April 30, 1936.[1] The Tool Company then stopped making the payments. Mrs. Haeseler demanded that they be continued for reasons which will appear hereinafter. The petitioner refused the demand and brought suit seeking a declaration by the court below that its obligations under the contracts had terminated with the payment made by it on April 30, 1936. Mrs. Haes-

eler died. Her daughter Mrs. Ziegler, the substituted respondent, filed an amended answer and counterclaim, asserting that certain of the patents covered by the agreements expired subsequent to April 30, 1936 and that the life of the contracts, and hence the Tool Company's obligation to pay the royalty, endured until the last monopoly granted by these patents had expired. The court below found that the petitioner's obligation to pay the royalty continued until January 29, 1941 and purportedly[2] gave judgment for the respondent for $833.33 a month with interest up to and including the date last stated.[3] Both parties have appealed, Mrs. Ziegler in part because the court below imposed on her the cost of proving the expiration date of a Belgian patent covered by the 1919 agreement.

■ That there is a justiciable controversy within the purview of the Declaratory Judgments Act, Section 274d of the Judicial Code, 28 U.S.C.A. § 400, may not be doubted. The existence of such a controversy is to be determined by the decisions of the federal courts. Dewey & Almy Chemical Co. v. American Anode, Inc., 3 Cir., 137 F.2d 68, and the authorities therein cited. It is clear also that the provisions of the Act are procedural and create no new substantive rights. Sinclair Refining Co. v. Burroughs, 10 Cir., 133 F.2d 536; McCarty v. Hollis, 10 Cir., 120 F.2d 540. The jurisdiction of the district courts of the United States was not enlarged by the Act. Putnam v. Ickes, 64 App.D.C. 339, 78 F.2d 223; Doehler Metal Furniture Co. v. Warren, 76 U.S.App.D.C. 60, 129 F.2d 43, 45-46, certiorari denied 317 U.S. 663, 63 S.Ct. 64, 87 L.Ed. 533; Borchard, Declaratory Judgments, 2nd Ed. p. 233. The petition in the case at bar alleges diversity of citizenship and jurisdictional amount. The respondent's counterclaim contains similar allegations. Suit was brought in the District Court of the United States for the Eastern District of Pennsylvania. In diversity cases the district courts must apply the conflict-of-laws rule of the State in which they sit. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. It is necessary there-

---

[1] No royalties other than the prescribed minimum were paid. Haeseler's prescribed percentage of the sales being insufficient to exceed the prescribed minimum.

[2] We use the word "purportedly" for the

reasons which appear in the second paragraph of Part III of this opinion.

[3] The first opinion was reported in 63 F.Supp. 146. The District Court later amended its original opinion. The second opinion is reported in 51 F.Supp. at page 199.

fore to apply the conflict-of-laws rule of Pennsylvania. Under the Pennsylvania conflict-of-laws rule the interpretation of a contract is determined by the law of the place of contracting. Benners v. Clemens, 58 Pa. 24. By the law of Pennsylvania a contract is made when and where the last act necessary for its formation is done. W. G. Ward Lumber Co. v. American Lumber & Mfg. Co., 247 Pa. 267, 93 A. 470, Ann. Cas.1918A, 451. See Newspaper Readers Service, Inc. v. Canonsburg Pottery Co., 3 Cir., 146 F.2d 963, 965. Our difficulty in the case at bar lies in determining when and where the last acts necessary for the formation of the contracts sub judice were performed. No evidence was offered as to where the contracts were executed or delivered and this question was not dealt with on the briefs of the parties or in the opinions of the court below.[4] In the absence of proof as to the place of occurrence of the operative facts we will presume that they occurred in Pennsylvania. See American Type Founders, Inc. v. Lanston Monotype Mach. Co., 3 Cir., 137 F.2d 728, 729; Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 233, 148 A.L.R. 841, certiorari denied 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539. We, therefore, will apply the law of Pennsylvania in interpreting the contracts.

I

If the life of the monopoly of any patent named or granted under an application named in the 1919 contract extends beyond the lives of all of the respective monopolies of the patents named or granted under an application named in the 1921 agreement, Mrs. Ziegler's rights in the suit at bar rest in the 1919 agreement and it is unnecessary to discuss specific provisions of the 1921 agreement other than to state that Haeseler and the Tool Company agreed that the 1921 agreement should be supplemental to and form a part of the 1919 agreement. For the reasons hereinafter set out we conclude that the life of the monopoly of the Belgian Patent No. 247,-347 granted on Application No. 6,269 must be treated as having extended beyond the monopoly of any patent named or granted under an application named in the 1921 contract.

Application No. 6,269 was filed with The Minister of Industry, Labor and Supplies of the Kingdom of Belgium on November 6, 1914 at Havre, France, the temporary seat of the Belgian Government during the First World War. The application was filed pursuant to the Belgian Act of May 24, 1854 but issued, according to the statement appearing upon its face, pursuant to the Belgian Act of October 11, 1919. Despite the limitation in the license of the 1919 contract authorizing the Tool Company only to make and sell the device, and perhaps because of the provision of ·the 1921 agreement hereinbefore specifically referred to, the Belgian patent issued in the name of the Tool Company. Under the Belgian law the monopoly of a patent ordinarily endures for twenty years from the date of the filing of the application. If other conditions and circumstances, to be discussed hereinafter, had not intervened, the monopoly of the Belgian Patent No. 274,-347 would have expired on November 6, 1934, a non-critical date in the determination of the case at bar. The circumstances and conditions referred to are as follows.

Article 13 of the Belgian Act of October 11, 1919,[5] provides in pertinent part: "In computing the duration of patents which had not expired before the 1st of August, 1914, no account shall be taken of the time between this date and the falling due of the first annuity which shall follow the date to be fixed by the Government in execution of paragraph 2 of Article 11." Paragraph 2 of Article 11 provides: "The payment of the first annuity in abeyance shall become due on the day on which it is annually due next after a date to be fixed by Royal Decree. No period of delay shall

---

[4] The petition alleges that both contracts were executed at Chicago, Illinois. The respondent's answer admits the execution of the contracts but denies "knowledge or means of knowledge" as to where the contracts were entered into and demands proof. We note that at an adjourned regular annual meeting of the board of directors of the Tool Company held in New York City on Monday, March 17, 1919, the 1919 contract was ratified. There is little in the record to indicate that such a ratification was necessary in order that the agreement might be valid. A form of ratification to be made by the board of directors of the Tool Company is appended. to the original of the 1919 contract. This form is unexecuted. The resolution which was passed recited that the contract had been delivered but is silent as to the place of delivery.

[5] See Patent Laws of the World, Belgium. Supplement No. 49.

be allowed for this payment. The subsequent annuities shall be payable each year, on the anniversary of the day on which the application for the patent was lodged." The date fixed by Royal Decree as to Belgian nationals does not appear from the record, but we entertain no doubt that it was after January 10, 1921 (January 10, 1921 being the first anniversary date of the effective date of the Treaty of Versailles, January 10, 1920), and prior to November 6, 1921, the due date of the 7th annuity on the Belgian patent.[6] Article 3 of the Belgian Act of 1854 provides for an annual and progressive tax or annuity to be paid to the Belgian Government on each anniversary date of the filing of the application.

Article 22 of the 1854 Act, as amended, provides that when the tax fixed by Article 3 shall not have been paid within a month of coming due, the owner of the patent, " * * * after previous notice, shall, under penalty of being deprived of the rights which his title confers upon him, pay, before the expiration of six months from the date at which the tax was due, the sum of 10 francs, in addition to the annuity payable. Forfeiture of Patents shall be published in the 'Moniteur.' "[7] Article 23 of the 1854 Act provides that the owner of a patent must work the article in Belgium within one year of the commencement of working abroad; that the Government may by Royal Decree inserted in the "Moniteur", grant a prolongation of one year at most for the working; but if the patent is not worked by the expiration of the first year, or of the extension if granted, the patent shall be annulled by Royal Decree.

If it was not for the contents of certain letters which passed between Haeseler and the Tool Company it would be clear that the Tool Company, obligated by the terms of the 1919 contract to preserve the patent in Belgium, was obligated to pay the taxes and to cause the patent to be worked in Belgium. It should be stated in this connection that the Tool Company paid the first year's tax due on the Belgian application when it was filed and paid the taxes for the four successive years coming due respectively on the 6th day of November of 1915, 1916, 1917 and 1918. It seems probable also that the Tool Company paid the sixth annuity due on November 6, 1919.[8] We will treat the case as if that annuity was paid.

The letters which the petitioner insists relieved it of the obligations referred to are as follows. On September 1, 1920, Price, a vice-president and treasurer of the Tool Company wrote to Haeseler and stated that he had received advice from the Tool Company's patent lawyers " * * * that the seventh years tax on * * * Belgian application No. 6269 will fall due on November 2nd, next. They also state that a working of the Belgian application should be effected on or before that date. I apprehend that if this working is not consummated before November 2nd, that it will invalidate the patent in Belgium, which as you probably know applies to the Haeseler-Sherwood Rock Drill. It does not seem to be practicable to arrange for working. Can you think of any real objection to allowing the patent to lapse." He went on to state, "Some time ago I made an investigation of this subject, and learned that it was the custom of some of the larger American corporations to obtain patents in the Continental European countries and then permit them to lapse upon the theory that there is little likelihood of any serious competition arising from a product manufactured in those countries, and the fact that a patent had been obtained would prevent any resident of the countries * * * obtaining a patent wrongfully, and then holding up the real owner of the invention for royalty before they would be permitted to continue the sale in that particular country * * * While these fees are small individually, the aggregate is considerable especially if we can obtain the desired degree of protection

---

[6] It appears from the evidence of the expert, Leonard J. Robbins, called by the petitioner, that this date was " * * * exceptionally fixed in favor * * * [of] Nationals of the United States * * * " as of March 3, 1921. See Supplemental Appendix, p. 145a. In our view of the case, however, the date fixed in favor of citizens of the United States is not pertinent for reasons which will appear.

[7] The official gazette of the Kingdom of Belgium, the "Moniteur Belge."

[8] The receipt which the Tool Company received from the Belgian Patent Office states that the Tool Company paid an annuity of sixty francs to the Belgian Ministry at Brussels on September 6, 1919, for the sixth annuity on a patent lodged at Havre November 6, 1914, "relating to: spool for the dyeing of textiles." The parties seem to agree that this represented the sixth annuity due on the Belgian application.

without incurring this expense." It will be observed that the patent had already issued when this letter was written though Price apparently regarded the application as still pending. On September 20, 1920 Haeseler replied to Price and stated that he was "willing" that the Belgian patent should be allowed to lapse. Actually the patent had issued as of November 17, 1919. No taxes were paid in Belgium on Patent No. 274,347 after the sixth annuity which came due on November 6, 1919. On July 8, 1922 Haeseler reiterated his approval of the course proposed to be taken in respect to the Belgian patent by writing to Price: "As far as I am concerned, it is agreeable to me in connection with my foreign patents under License Agreement with the C. P. T. Co. to abide by whatever action you may deem to be to the best interests of the Chicago Pneumatic Tool Company."

It is the contention of the petitioner that the Belgian patent lapsed and its monopoly expired for non-payment of taxes and for non-working within the period prescribed by the Belgian Act of 1854 following November 6, 1920; or at least that Haeseler if he were alive would be estopped to deny that the monopoly of the patent had not ceased within six months after November 6, 1920, the end of the grace period prescribed by Article 22 of the Belgian Act of 1854 as amended; that Haeseler's representative, Mrs. Ziegler, is in a like position. We cannot agree with this contention for the reasons which follow.

▮▮▮▮ First, the 1919 contract and the 1921 contract were sealed instruments. The law of Pennsylvania governs and under that law it is settled that consideration or a seal is an essential for the discharge of a contractual duty or obligation as for the creation of a contractual right or duty. Restatement, Contracts, Section 406; Evesson v. Ziegfield, 22 Pa.Super. 79; Rehm v. Frank, 16 Pa.Super. 175; Hecht v. Hecht, 301 Pa. 379, 152 A. 537; Kidder v. Kidder, 33 Pa. 268; In re Campbell's Estate, 7 Pa. 100, 47 Am.Dec. 503; Kennedy v. Ware, 1 Pa. 445, 44 Am.Dec. 145; Miller v. Hemler, 5 Watts & S. 486; International Harvester Co. v. Norris, 25 Dauph.Co.Rep. 279. There was no consideration to Haeseler for foregoing any rights which he had under the 1919 contract to the maintenance of the Belgian patent to its full term. The letters between Price and Haeseler of course were not sealed instruments. Moreover, it is apparent from Price's letter that the Tool Company hoped to retain a practical monopoly in Belgium for a period equivalent to the life of the monopoly of the Belgian patent if taxes had been paid and the patent worked as required by Belgian law.

▮▮▮▮ Our opinion in this regard is fortified by such decisions of the Supreme Court as Pohl v. Anchor Brewing Co., 1890, 134 U.S. 381, 10 S.Ct. 577, 33 L.Ed. 953; and Leeds & Catlin Co. v. Victor Talking Machine Co., 1909, 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805. These rulings supply persuasive analogies for the determination of the instant question for they indicate that the "term" of a patent means the period for which its monopoly could be maintained if all conditions necessary to sustain the life of the patent were fulfilled. In other words the language of the 1919 contract, heretofore quoted, "* * * to the full end of the terms for which said Letters Patent are or may be granted, * * *" requires that the term of the Belgian patent be treated as if it extended to the end of that period to which it could have been prolonged if the petitioner had paid all taxes due upon it and had caused it to be worked as required by the law of Belgium.

▮▮▮▮ Second, it will be observed that the terms of the 1919 contract, paragraph 2, provide that the licensor grants to the licensee the exclusive right to make and sell the devices covered by the patents or applications named in the contract "to the full end of the terms for which said Letters Patent *are or may be granted,*[9] in the United States of America and in the several foreign countries." The phrase "may be granted" is intransitive and means "to be able to be granted."[10] We are of the opinion therefore that the Tool Company by the 1919 agreement contracted to maintain the grant of the Belgian patent for the full period authorized by applicable Belgian law. We conclude that the petitioner's argument to the effect that the word "granted" means that the life or grant

---

9 Emphasis added.

10 Webster's New International Dictionary, 2nd Edition, states that the use of the word "may" intransitively is obsolete and reiterates this statement where the auxiliary verb so used is employed as here in an ellipsis of the infinitive. The phrase "a patent may be granted" is employed frequently in patent law.

of the patent must be limited to twenty years from the date of the filing of the application is not sound. The patent shows on its face that it actually issued as of November 17, 1919, pursuant to the provisions of the Belgian Act of October 11, 1919. The patentee therefore was entitled to the benefit of every provision of that Act that was or became applicable.

■ Third, the obligations of Haeseler and the Tool Company in respect to their status under the 1919 agreement insofar as the Belgian patent is concerned may be tested in another way. As stated hereinbefore the 1919 agreement expressly stipulated that during the term of the continuance of the contract Haeseler should not engage "in any competitive business." Assume arguendo that Haeseler following the exchange of letters between Price and himself had endeavored to manufacture and sell the device covered by the Belgian patent in Belgium for his own exclusive benefit. Could an injunction have been laid against him to prevent such exploitation? We entertain no doubt that a court of equity would have enjoined such actions by Haeseler. The Tool Company, as is demonstrated by Price's letter of September 1, 1920, intended to retain a practical monopoly upon the device covered by the Belgian patent in Belgium. There was a mutuality of obligations under the contract and as Haeseler would be bound so would the Tool Company.

■ One further point raised by the petitioner requires discussion. It cites such authorities as Wilson v. Rousseau, 4 How. 646, 45 U.S. 646, 686, 11 L.Ed. 1141; Hodge v. Hudson River R. Co., 12 F.Cas.No. 6,-559, and 48 C.J., Patents, § 429, in support of the proposition that the Belgian patent "was *granted* only once, on November 17, 1919, and then for a term of twenty years from November 6, 1914."; that, though by subsequent Belgian laws, the term of the patent might have been extended such an extension will not aid the respondent because Haeseler's rights under the 1919 contract are based upon the term for which the patent was *granted*. We have dealt briefly with one phase of this argument at an earlier point in this opinion. We pointed out that the patent stated on its face that it was issued pursuant to the 1919 Act and that therefore Haeseler was entitled to take advantage of the provisions of Section 13 of that Act and that the term of

the patent was for the period prescribed by the applicable Belgian law. To this, however, the petitioner might reply that since the provisions of Section 13 of the 1919 Act became available for Haeseler's and the Tool Company's benefit only by virtue of the Hague Convention (the effect of which will be discussed hereinafter) which was not effective in Belgium until May 23, 1929, the *grant* of the patent was fixed when it issued on November 17, 1919 and the rights of the parties under the 1919 contract must be determined by the *grant* as of the day last named. We think that such an argument would put too fine a point upon the intention of the parties as demonstrated by both the 1919 contract and the 1921 contract. It was the intention of both the Tool Company and Haeseler that the Tool Company should have the benefit of Haeseler's inventions and should pay him a royalty therefor for as long a time as the monopoly of a patent should exist. Neither party to the contract contemplated any metaphysical definition of the word "grant". Each party desired the benefits of the contracts for as long a time as any Belgian law or laws would permit.

Taking as our central and principal premise the legal necessity of treating the obligations of the parties to the 1919 contract as if the Tool Company had kept the Belgian patent in force by the payment of taxes and by working, we will now examine the rights of the parties as they appear to be established by the law of Belgium and certain treaties entered into by the Kingdom of Belgium and the United States.

■ Is the respondent entitled to avail herself of Article 13 of the Belgian Act of October 11, 1919, heretofore quoted? Article 14 of the Act provides that the benefits of Article 13 " * * * shall only apply as regards foreigners, to subjects of countries which have accorded to Belgian subjects privileges which have been recognized as equivalent by Royal Decree published in the Moniteur Belge." The respondent contends that the United States by the Nolan Act, 35 U.S.C.A. §§ 80–87, extended benefits equivalent to those of Article 13 of the Belgian Act of 1919 to Belgian Nationals. Obviously, however, this contention is incorrect. No law of the United States in force in 1919 or thereafter extended the term of any United States patent beyond the 17 years prescribed by law whether issued to a citizen of the United States or to a foreign national.

In making the foregoing statement we give due weight to the fact that the Commissioner of Patents of the United States by a proclamation dated October 20, 1921 recognized that " * * * the laws of Belgium * * * [afford] to citizens of the United States privileges substantially reciprocal to the privileges accorded by the Nolan Act * * * and that consequently the privileges specified in said act will be extended· to the subjects of Belgium, subject to the limitation that extensions will not be granted to relieve defaults falling under section 2 of the act for a longer period than seven years, five months, and nine days." The respondent lays great emphasis on the substance of this proclamation but the Nolan Act merely extended the time for filing an application for a United States patent to a foreign national (covered by treaty provisions which need not be specified herein) who had applied for a patent on an invention in his own country and who had been prevented by the war from filing an application for the invention in the United States Patent Office. Specifically, Section 2 of the Nolan Act, 35 U.S.C.A. § 81, provides an extension " * * * for the payment of any fee or for the taking of any action with respect to an application for patent * * * without the payment of extension fees * * *". The proclamation of the Commissioner of Patents of the United States correctly stated that the Belgian law gave "privileges substantially reciprocal" to our nationals insofar as the ·filing of applications was concerned, but in the case at bar we are dealing with an issued patent. The contents of the Commissioner's proclamation therefore are inapposite under the circumstances of the case at bar. Finally, on this phase of the case there is no proof that the King of the Belgians by Royal Decree published as required by the Belgian Act of 1919 recognized that the United States had extended privileges to Belgian nationals equivalent to those of Section 13 of the Belgian Act of 1919. The state of foreign law or the effect or operation of foreign law is a matter of fact and requires proof. See Blumenthal Import Corporation v. Thos. & Jno. Brocklebank, Ltd., 3 Cir., 148 F.2d 727.

The respondent also seeks to rely on certain provisions of The Versailles Treaty,[11] specifically on Articles 307 and 308. But these afford her no relief. Article 307 gives a minimum of one year "after the coming into force" of the Treaty to the nationals of the contracting Sovereigns without extension fees or other penalties to fulfill "any formality, pay any fees, and generally to satisfy any obligation prescribed" by the laws of the respective contracting Sovereigns in order to preserve rights in industrial properties such as patents. The defaults referred to are those occurring after August 1, 1914, caused by the First World War. Article 308 of the Versailles Treaty permits priority rights under Article 4 of the International Convention for the Protection of Industrial Property of 1883[12] to be extended in favor of the nationals of the subscribing Nations for six months after the coming into force of the Versailles Treaty, but these provisions were an aid to the filing of applications for patents or preserved rights of filing which either had not expired by August 1, 1914 or which had arisen during the period of the war. In view of our ruling that the Belgian patent must be treated as if the fees due upon it had been paid and as if it had been worked as required by Belgian law and that Haeseler's representative must be awarded a status under the 1919 contract commensurate with the full term of the patent, discussion of these provisions of the Versailles Treaty is in fact immaterial.

We come finally to the Convention for the Protection of Industrial Properties signed at the Hague on November 6, 1925. See 47 Stat. 1789. This was ratified by Belgium on May 23, 1929 and by the United States on March 6, 1931. The effective date of its provisions therefore was the day first named so far as Belgium was concerned. We return now to the Belgian Act of 1919. Article 13 of that Act was applicable to Belgian nationals without qualification or condition. If the Tool Company had been a Belgian national, the term of the patent would have been extended by the period from August 1, 1914 to the date of the first annuity payment following January 10, 1921. See paragraph

---

[11] Treaties, Conventions, International Acts, Protocols, and Agreements between the United States of America and other Powers published 1910–1923, Vol. 3, 67th Cong., 4th Sess., Senate Documents No. 348, p. 3329 et seq.

[12] See 25 Stat. 1372 and 38 Stat. 1645, the latter embodying the 1911 revision of the Convention.

2 of Article 11 of the Belgian law hereinbefore quoted, bearing in mind the fact, as hereinbefore stated, that the parties seem to agree that the Royal Decree fixing the rights of Belgian nationals to pay fees in arrears fixed the critical date as prior to November 6, 1921. It must also be remembered that the provisions of Article 13 of the 1919 Act are to be read in conjunction with those of paragraph 2 of Article 11 since that paragraph fixes the end of the running of the grace period and the extension of the term of a patent in Belgium. It follows that had the Tool Company been a Belgian national, the term or life of the monopoly of the patent sub judice would have been extended by adding to the normal 20 year period the span of time between August 1, 1914 and November 6, 1921, the due date of the Belgian tax or annuity for 1921. This amounts to 7 years, 3 months and 5 days. Since the 20 year term of the patent would have endured until November 6, 1934, we add the span of time stated and find that if the Tool Company had been a Belgian National and had paid the taxes and had worked the patent as the Belgian law required, the monopoly of the Belgian patent would have expired on February 11, 1942. Our reasons follow.

Article 2 of the Hague Convention of 1925 provides in pertinent part that "Nationals of each of the contracting countries shall in all other countries of the Union, as regards the protection of industrial property, enjoy the advantages that their respective laws now grant, or may hereafter grant, to their own nationals. * *" The respondent contends that this provision gave to Haeseler all the rights which a Belgian national would have had in respect to the extension of the Belgian patent under consideration.

The petitioner, as one would expect, contends to the contrary. It cites the testimony of its expert witness, Robbins, and a decision of the Court of the First Instance at Brussels in the case of the Hoffman Machinery Corporation as reported at p. 68 of "La Propriete Industrielle",[13] No. 4, of April 30, 1932. Robbins' conclusions on the question of law involved rest substantially on this decision. In the cited case it was alleged before the Belgian court that certain "so-called Vaprex devices manufactured and sold by the defendants" infringed a patent [14] owned by the plaintiff, Hoffman. The defendants contended that the plaintiff's patent had expired on May 26, 1928 under the Belgian Act of 1854 because of an apparent failure of the patentee to pay taxes due under Article 3 of the 1854 Act and because of the effect of the provisions of Article 14 of the 1854 Act which provides that the term of a Belgian patent granted to a foreign national shall not exceed the longest term granted to that foreign national in his own country for the same invention. The plaintiff insisted that the provisions of Article 13 of the Belgian Act of 1919 operated in its favor. The Belgian Court referred to the provisions of Article 14 of the 1919 Act and held that the provisions of Article 13 could not operate in favor of the Hoffman Company since the United States had not extended reciprocal benefits to Belgian nationals. The Belgian Court's conclusion in this regard seems clearly correct for reasons heretofore stated in this opinion. The plaintiff went further, however, and insisted that Section 2 of the Hague Convention extended the term of the patent for its benefit pursuant to the provisions of Article 13, precisely as if the Hoffman Company had been a Belgian national. This, on the surface, seems to be precisely the same argument which the respondent makes in the case at bar. It was held invalid by the Belgian Court.

There is a pertinent difference, however, between the facts of the Hoffman case and that at bar. The Belgian Court held that the Hoffman patent "lapsed" on May 28, 1928. It pointed out that the Hague Convention of 1925 was not ratified by Belgium until May 23, 1929 and that the effect of the Belgian act of ratification was not retroactive and therefore could not revive a patent the term of which had expired. Under our central and principal premise we must treat the monopoly of the Belgian patent in issue in the case at bar as if it had been in existence on May 23, 1929.

---

[13] This is a Swiss publication and is not an official report. We entertain no doubt, however, as to its accuracy and will consider its contents as though the report were official.

[14] The decision deals with two patents.

The portion of the opinion which has been translated deals primarily with only one Belgian patent, No. 208,280. The ruling of the court as to the other patent No. 283,503 seems immaterial.

The petitioner lays emphasis on that portion of the opinion of the Belgian Court which reads: " * * * there is * * * an absolute incompatibility between the principle of equality established by the International Convention and the provisions of Article 14 of the law of October 11, 1919, so that the latter has consequently abrogated, on the point in question, the various prior laws which have successively ratified the International Convention;

" * * * the plaintiff has vainly contended that in this conflict of laws, those which ratify the International Convention should apply to the plaintiff because they relate to the rights of people in general;

" * * * actually it was never the intention of the authors of the laws which have ratified the Convention that the provisions which they enacted should be applied in circumstances where such application would be contrary to measures taken to assure the economic restoration of the State territory which was invaded and devastated by the enemy; * * *"

We think, however, that the phrase "International Convention" expressed by the words "la Convention d'Union" is not a reference to the Hague Convention of 1925 but is a reference to the Convention of Paris of 1883, to its revision at Washington in 1911, hereinbefore referred to, and probably also to the Brussels Convention of 1900. The respondent argues otherwise but the strength of its argument is vitiated by the following portions of the opinion of the Belgian Court: " * * * the plaintiff also entirely vainly contended that in any event the plaintiff had the right to the benefit of the prolongation by virtue of the law of May 23, 1929, ratifying the revised Hague text of the International Convention which established without restriction or reserve the principle of equality and did not authorize any exceptions;

" * * * actually the said law is not retroactive and consequently cannot revive patent No. 208280 which lapsed on May 25, 1928 at the end of its term; * * *"

The decision of the Belgian Court is of little pertinency in the case at bar. The decision is to the effect that the Hoffman Company Patent No. 208,280 could not be revived by operation of Article 2 of the Hague Convention, 47 Stat. 1796, because,

as we have stated, the term of the patent came to an end before the effective date of the Hague Convention. Thus far the decision favors neither the petitioner nor the respondent in the case at bar but is simply immaterial. The Belgian Court, however, by way of dicta stated that the Hague Convention established "without restriction or reserve the principle of equality and did not authorize any exceptions." This constitutes some evidence that Section 13 of the Belgian Act of 1919 would serve to extend the term of a Belgian patent owned by any foreign national if the patent was in existence at the time of the effective date in Belgium of the Hague Convention. Indeed we cannot see how the law of Belgium could be otherwise unless that Kingdom were to stand in breach of its solemn treaty obligations, a condition which no court should presume to exist in the absence of the strictest proof. Proof of such a breach is totally lacking in the case at bar.

We conclude that Haeseler's right and that of his widow to the payment of the annual minimum royalty continued under the 1919 contract until February 11, 1942, the date on which the Belgian patent would have expired had the annuities been paid and the patent worked as required by Belgian law.[15]

## II

In view of the difficulties inherent in a proper application of the Belgian law in the case at bar, we conclude that it is appropriate to determine the questions presented by the execution of the 1921 contract since the case at bar may come before the reviewing Court.

It is a general rule of law that where one contract refers to and incorporates the provisions of another both shall be construed together. The Pennsylvania cases indicate that even where there is no specific reference to a prior agreement or prior agreements, several contracts shall be interpreted as a whole and together. Wilson v. Viking Corporation, 134 Pa.Super. 153, 3 A.2d 180; Landreth v. First Nat. Bank, 346 Pa. 551, 31 A.2d 161. See also Restatement, Contracts, Section 228, discussing the principles of integration of contracts. The petitioner contends that the 1919 contract constituted a limited license

[15] It may be noted parenthetically that the record shows no publication of a Royal Decree in the "Moniteur" cancelling the term of the patent for any reason either before or after the critical date of May 23, 1929.

to the Tool Company giving it the right to make and sell the devices covered by the patents and applications covered by the contract as well as any improvements thereto; that the 1921 agreement constituted an equitable assignment of all of the licensor's rights since the licensee received the right to make, use and sell the devices designated in it. The petitioner contends also that the 1919 license agreement was personal and nontransferable (despite the fact that the Belgian patent No. 274,347 issued in the name of the Tool Company), whereas the absolute grant of the license agreement of 1921 expressly was made assignable. From these facts the petitioner argues that the royalty was payable by it to the end of a monopoly granted by the latest patent covering any device included in the 1919 agreement; that patents covering the devices specified in the 1921 agreement would not extend the life of the contracts; and that Haeseler gave over every right that he had to the devices specified in the 1921 contract or any improvement thereto for the sum of $2,000 admittedly paid to him.

■ As to the contention that the sum of $2,000 admittedly paid by the petitioner to Haeseler under the 1921 agreement constituted the full consideration for the equitable assignment, attention is directed to the receipt given by Haeseler to the Tool Company, which states that the money was paid "In accordance with agreement executed January 27th, 1921, to reimburse * * * [Haeseler] for expenses of experimental work in connection with applications for Letters Patent on all inventions to this date." It should also be pointed out that the agreement of 1921 recites that there were other valuable considerations moving between the parties. But the real difficulty of the Tool Company's position is apparent from other terms of the 1921 agreement. The contract gives the licensee the right to make, use and vend the devices covered by the two applications "to the full end of the terms for which said Letters Patent may be granted, * * * subject to the terms and conditions of * * * [the] license agreement" of 1919. As to the licensing of the improvements specified in the 1921 contract substantially identical language is used. Another paragraph of the later agreement provides, as we have stated, that the 1921 agreement "is to be supplemental to and form a part of the * * * agreement" of 1919. Construing the two contracts together from the four corners of the respective documents, we are of the opinion, expressed by the learned District Judge, that the licensee acquired the right to make, use and sell the devices covered by the respective patents and patent applications and that the Tool Company agreed to make the royalty payments until the expiry of the monopoly granted by the latest patent embraced within either agreement. If the contracts be so construed there are no conflicting provisions.

■ The learned District Judge, however, permitted evidence aliunde in an effort by the parties to throw light upon the meaning of the agreements. Passing by any questions as to the admissibility of certain testimony in view of the Pennsylvania Act of May 23, 1887,[16] which need not be considered under the circumstances of the case at bar, it is clear from the testimony of Herbert A. Jackson, president of the Tool Company, that the interpretation which the petitioner attempts to put upon the 1921 agreement is insupportable. This witness was asked the question, "In the making of * * * [the 1921] agreement was there any intention that the term of the first agreement should be extended?" He answered, "No, it was just to embrace some stuff under it that I thought should have been there." He testified also that he was out of patience when he found that Mr. Haeseler was demanding something in addition to what he was to receive under the 1919 agreement and that the inventor then said to him, " '* * * if you give me $2,000, or some such amount, * * * we will redraft it and enclose the whole thing under the umbrella you want, and the way, perhaps, it should be,' and we went ahead and did it." The language used seems incapable of any other interpretation than that the inventions referred to in the 1921 agreement were to be treated on precisely the same basis as those specified in the 1919 agreement. We are of the opinion, therefore, that the District Court committed no error in holding that the Tool Company was required to continue the payment of the minimum royalty until the expiry of the latest patent covering any device included within the purview of either contract.

---

[16] See 28 P.S.Pa. § 322. See also the provisions of Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, and Pierkowskie v. New York Life Insurance Co., 3 Cir. 147 F.2d 928.

Under this view, on what day did the Tool Company's obligation to pay the royalty come to an end assuming arguendo that the expiry date of the Belgian Patent is immaterial? The District Court concluded that since United States Patent No. 1,481,865 expired on January 29, 1941, the Tool Company's obligation continued until that date. The patent was granted on application, Serial No. 306,533, enumerated in the 1921 contract. There can be no question then, if the rights of the parties are to be determined by the patents of the 1921 contract, that royalties should have been paid at least until January 1, 1941. The respondent contends, however, that United States Patent No. 1,634,780, which expired on July 5, 1944, extended the life of the contracts to the date last mentioned.

As to Patent No. 1,634,780, other and more difficult questions are presented. The respondent contends first that '780 claims an improvement to the "Hummer" drill disclosed in Haeseler's Patents Nos. 1,146,870, 1,171,116, 1,181,383 and 1,185,309 enumerated in the 1919 contract. She takes the position that the device of '780 is within the purview of paragraph 10 of the 1919 contract. The pertinent provisions of paragraph 10 are set out below.[17] The construction put upon this paragraph by the District Judge was correct insofar as he held that an improvement within the purview of paragraph 10 must have been an improvement on tools manufactured and sold by the Tool Company, tools covered by one of the patents or applications maturing into patents enumerated in the 1919 agreement. '780 claims an "Air-Cooled Pneumatic Hammer." The specification states the undoubted fact that when a pneumatic hammer is employed continuously to drive hot rivets, the heat is communicated from the rivets to the hammer causing its cylin-

der to expand in its front portion, contracting the bore and causing the piston to jam. The specification points out also that the exhausting compressed air flowing from the cylinder expands on reaching the outer air sometimes forming ice which clogs the hammer passages, choking the piston. These are the two impediments to the operation of the hammer which the invention seeks to obviate. The claims of the patent invariably refer to a "pneumatic hammer." The specification almost always speaks of the invention as a pneumatic hammer. But only one portion of the specification supports even remotely the respondent's contention. That part is as follows, "It is of course to be understood that my present invention is not limited to any special type of pneumatic hammer but can be employed to advantage with any desired or conventional type of main distribution valve mechanism, throttle valve mechanism or hammering piston, the invention residing more particularly in the construction of the barrel or cylinder."

Employing the "inventor's vocabulary" doctrine, the respondent insists that a drill is the equivalent of a hammer. But a drill is not a hammer. A drill does not come into contact with hot rivets. It is possible that air-cooling the space within and around the operating chamber might be of some assistance in increasing the efficiency of the operation of a drill, but the evidence which the respondent offers in support of such a possibility is slight indeed. But the short answer to the respondent's contentions is that the claims of the patent appropriated a pneumatic hammer and therefore did not claim a drill or any part of a drill.[18] The Tool Company's obligation to pay royalties depended on monopolies granted by the patents issued to Haeseler. The theory advanced by the respondent that

---

[17] "10. * * * The Licensor * * * agrees that in the event of his applying for and obtaining any Letters Patents relating to improvements in the tools, machines and devices manufactured and sold by virtue of this agreement, he will grant, and he hereby does grant unto the Licensee, the exclusive right to make and sell any and all of such improvements under any Letters Patents that are or may be obtained therefor, under the terms heretofore set forth; providing, however, that the licensee, upon the indication of its desire to use said inventions and improvements, shall pay all expenses to be incurred or theretofore incurred by the Licen-

sor, in connection with the applications for and securing Letters Patents covering said improvements."

[18] There is evidence that Haeseler himself considered that the device of '780 extended the life of the contracts under consideration. See the self-serving declaration of his will. There is also evidence that the Tool Company paid, or at least reimbursed Haeseler, for fees expended in connection with the prosecution of the patent application and may have considered the device of '780 as constituting an improvement to one or more of Haeseler's inventions.

because Haeseler supplied the Tool Company with an idea which might have been applied by way of improvement to a drill, even absent an appropriate claim in a patent, the life of the contracts was extended, is untenable. The finding of the District Court that the device of '780 was not an improvement to the Hummer drill is correct.

The respondent also takes the position that '780 discloses a device licensed under paragraph 2 of the 1921 contract.[19] The District Judge concluded that the device of '780 was not within the purview of the paragraph because the application for the patent was not enumerated in the 1921 contract, the application having been filed in the Patent Office prior to the execution of that contract. The provisions of paragraph 2 are set out below.[20] The District Court construed the phrase "devices that may be invented by the Licensor during the continuance of" the 1919 contract as sounding in the future. In other words, the court held that the language of the paragraph showed the intention of the parties to include within paragraph 2 only those inventions made by Haeseler during the continuance of the 1919 agreement after the date of the execution of the 1921 contract, viz., January 27, 1921. In our opinion this is a correct interpretation of paragraph 2. The words "may be invented" should not be construed to read "have been or may be invented". The District Court committed no error in its ruling in this respect. It follows that the obligation of the petitioner to pay the minimum royalty continued (the Belgian patent covered by the 1919 agreement aside) until January 29, 1941, the date of expiration of United States Patent No. 1,481,865.

### III

Other questions of contractual construction arise, however, whether the date January 29, 1941 (the day of the expiration of the term of United States Patent No. 1,481,865) or the date February 11, 1942 (the day on which the Belgian Patent No. 274,347 should have expired) be employed as the terminal of the Tool Company's obligation to pay the minimum royalty to Haeseler and to his widow. Since we are of the opinion that such expiry date of the Belgian patent is the critical date we will employ the date of February 11, 1942 as the terminal date. How much does the petitioner owe the respondent interest aside? Paragraph 8 of the 1919 contract provides that the licensee should pay to the licensor $10,000 "for each and every year during the term of this contract in equal monthly installments on the first day of each calendar month." The first 1919 contract was dated January 27th. It expired on February 11, 1942. In other words it endured for 23 years and 15 days. Difficulty arises because of the 15 day period, encompassed by the days January 27 to February 11 (1942) inclusive. The respondent claims that the 1919 contract provided for "ad valorem" royalties with a minimum for each and every year to be credited on account of the "ad valorem" royalties. We do not grasp the significance of the quoted phrase in connection with the problem presented. The royalties specified in paragraph 3 of the 1919 contract are required to be paid, as is the minimum royalty, on the first day of each calendar month. The first day of the calendar month in which the contract terminated was February 1, 1942. None the less the contract went into its 24th year. It will be observed at once that the calendar months provisions of the 1919 agreement and its provisions for yearly payments are in conflict. Haeseler's employment was from the 27th of each month commencing on January 27, 1919, to the 27th of the following month, irrespective of the fact that he was paid on the first day of each calendar month. We conclude that the 1919 con-

19 The District Court stated in its first opinion, 56 USPQ at p. 515, "It is admitted that '780 was an improvement upon the Haeseler ball valve pneumatic hammer * * *." We have found nothing in the record which indicates to our satisfaction that the petitioner made such an admission. We shall not extend this opinion by reference to or quotations from the findings of fact or requests which seem inconsistent with the statement quoted.

20 "2. * * * the Licensor hereby grants to the Licensee, its successors and assigns, the exclusive right to make, use and sell any tools, machines and devices that may be invented by the Licensor during the continuance of the said agreement between the Licensor and Licensee dated the 27th day of January, A. D., 1919, subject to the terms of that agreement, whether or not such tools, machines and devices be of the same class as the particular tools, machines and devices referred to in said agreement, or be improvements thereon."

tract must be so construed; that Haeseler's representative will receive the minimum royalty for a period of 23 years and 15 days; that is to say, for 23 years and 15/365ths of a year.[21]

There is a dispute between the parties as to whether the petitioner should be credited with 207 monthly payments. Actually it was credited by the court below with only 206. The evidence in the record is insufficient to permit this issue to be determined. The burden of proving the payments was upon the Tool Company and it has failed to meet that burden. However, since the judgment must be reversed for the reasons hereinbefore stated, after remand, the court below, in an appropriate exercise of its discretion, may permit the parties by appropriate pleadings and proof to present the issue of the number of payments made for the determination of the District Court.

Paragraph 12 of the judgment orders the respondent to pay the petitioner the sum of $639.50 under Rule 37 (c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The issue adjudicated by this part of the decree arose because of the proof which the petitioner made as to the law of Belgium in respect to the expiration date of the Belgian patent. The petitioner made a request of the respondent pursuant to Rule 36 (a) of the Rules of Civil Procedure for an admission that Canadian Patent No. 183,912, enumerated in the 1919 agreement, was the last to expire of all the patents specified therein. The respondent first replied that she had "no knowledge or means of knowledge of the date of application * * *" of a Transvaal Patent also enumerated in the 1919 contract or of the date of the Belgian application. Therefore, the respondent amended her reply to the petitioner's request for admissions and, referring to certain official Belgian publications, asserted that the Belgian patent expired after the Canadian patent and also denied that the Canadian patent was the last to expire of the patents enumerated in the 1919 agreement. At the trial the petitioner produced the expert witness who testified concerning the law of Belgium, as to certain phases of international law as hereinbefore set out, and who, assuming the payment of Belgian taxes as required by law, none the less arrived at a date of expiry of the Belgian

patent earlier in point of time than that of the Canadian patent.

The admission called for by the petitioner, as we view the case would have been of no pertinency if made. The Canadian patent, which the petitioner insisted possessed the latest monopoly, was irrelevant to any issue presented by the case whether Haeseler's right to minimum royalty be deemed to be governed by the term of the Belgian patent or by United States Patent No. 1,481,865. The Tool Company, the petitioner under the Declaratory Judgments Act, had the burden of proving the date of the expiration of the latest patent within the purview of either of the two agreements. That burden included the obligation to prove the expiration date of the Belgian patent. We can perceive no reason why under the circumstances the cost of the expert called by the petitioner should be imposed upon the respondent. The court below was in error in so imposing it.

The judgment is reversed and the cause is remanded with the direction to proceed in conformity with this opinion.

---

[21] We note that the latest critical date claimed by the respondent in her pleading is January 10, 1941. Upon remand the respondent may be permitted to amend her pleading to conform to the evidence. See Rule 15(b).